# In the United States Court of Federal Claims

No. 15-945C
(Filed: April 1, 2021)
(Re-Filed: April 21, 2021)[1]

* * * * * * * * * * * * * * * * * * * * * * * *

4DD HOLDINGS, LLC, and
T4 DATA GROUP, LLC,

              *Plaintiffs*,

v.

THE UNITED STATES,

              *Defendant*,

and

IMMIX TECHNOLOGY, INC.,

              *Third-Party*.

Copyright infringement;
Spoliation sanction;
Motion for fees and costs;
Expert fees; Attorney
fees; RCFC 37.

* * * * * * * * * * * * * * * * * * * * * * * *

*Roman M. Silberfeld*, Los Angeles, CA, with whom were *Ronald J. Schutz* and *Christopher K. Larus*, for plaintiffs.

*John T. Todor*, Senior Trial Counsel, United States Department of Justice, Civil Division, Washington, DC, with whom were *Jeffery Bossert Clark*, Acting Assistant Attorney General, *Robert E. Kirschman*, *Jr.*, Director, *Elizabeth M. Hosford*, Assistant Director, for defendant.

---

[1] This opinion was originally issued under seal in order to afford the parties an opportunity to propose redactions of protected material. The parties filed a joint document on April 16, 2021, notifying the court that no redactions are necessary (ECF No. 218). We thus reissue this opinion without redactions.

OPINION

Pending in this copyright action is plaintiffs' motion for fees and costs expended because of defendant's negligent and intentional destruction of evidence. We previously awarded attorney fees and other costs as a spoliation sanction. *4DD Holdings, LLC v. United States*, 143 Fed. Cl. 188, 131-34 (2019). The quantum and reasonableness of those costs are now before us on a fully briefed motion. Oral argument was held on January 22, 2021. We grant the motion in part and deny the motion in part, as explained below, and defer ruling on the issue of Tetra Engineering's costs.

BACKGROUND

The complaint was filed in August 2015. It alleges that the government, by and through the Defense Health Agency ("DHA"), infringed plaintiffs' software copyright by exceeding the number of installations allowed by the license that DHA purchased from a third-party vendor, Immix Technology, Inc. ("Immix"). The lawsuit was preceded by a joint investigation and "true-up" by the parties as to the number of software installations present on defendant's servers. As a result, in December 2014, DHA agreed to pay for an additional 168 copies of the Tetra program ("Tetra"), as it is known, via a $1.7 million dollar contract modification with Immix.

Agency counsel purported to institute a litigation hold in November 2015, which was reissued in February 2016. Plaintiffs sent their initial production requests in May 2016. Defendant responded in July 2016. The parties agreed to a fact discovery plan shortly thereafter. Despite plaintiffs' filing of the lawsuit, DHA proceeded with its plan to decommission the Development and Testing Center ("DTC") at which the Tetra software was installed. This process resulted in the physical destruction of the hard drives at the DTC. The destruction began as early as February 2015.

After document discovery revealed to plaintiffs that the virtual machines using the software at the DTC had been deleted, 4DD requested additional information from government counsel. In March 2017, plaintiffs requested copies of the DTC hard drives after learning of its shut down. Defendant eventually provided images of those hard drives. Plaintiffs also sought information regarding government-issued laptops used by a DHA subcontractor, Systems Made Simple ("SMS"). In May 2017, defense counsel informed plaintiffs that the contents of those computers had been erased and the laptops turned over to new users.

Plaintiffs then asked the court for additional discovery regarding evidence retention, which we granted in late 2017 (ECF No. 92). After conducting fact and 30(b)(6) depositions and receiving a trove of new emails regarding the SMS laptops, plaintiffs filed a motion for spoliation sanctions (ECF No. 143). In April 2019, after briefing and argument, we granted that motion, finding that DHA had negligently and, in one instance, intentionally destroyed evidence, including intending to deprive plaintiffs of information by erasing the SMS laptops.[2] *4DD Holdings, LLC*, 143 Fed. Cl. at 131-34. We declined, however, to enter a default judgment on liability but did impose both an adverse inference to be drawn from the fact of spoliation and granted to plaintiffs an award of "fees and costs for bringing [the] motion and conducting additional discovery necessary to assess and ameliorate the government's spoliation." *Id.* at 133.

We instructed plaintiffs to file a motion subsequently for those fees and costs, which it did on November 5, 2020. It attached to its motion 13 exhibits in support, which include, *inter alia*, declarations of counsel, declarations from several consultants engaged in discovery related work, billing records of current and former counsel, a declaration from 4DD's Chief Executive Officer ("CEO"), and billing invoices from a 4DD subsidiary, Tetra Engineering, LLC, which performed software engineering and consulting services in support of plaintiffs' effort to reconstruct destroyed evidence.[3] *See* Pls.' Mot. for Fees Ex. 10.

## DISCUSSION

Plaintiffs seek $1,795,479 in attorney fees billed by current and former counsel and $2,150,589.23 in other costs it alleges were expended in connection with or as a result of defendant's destruction of evidence. The bulk of the non-attorney costs are hours expended by an expert, Monty Myers, and work performed by technical consultants at Tetra Engineering in support of plaintiffs' effort to reconstruct missing evidence or to account for its absence in its damages model. Defendant opposes the amounts sought both as to the number of hours expended by attorneys and the hourly rates

---

[2] In the same opinion, we also denied defendant's partial motion to dismiss, because we found that plaintiffs had established that defendant authorized or consented to SMS's use of plaintiffs' software at its lab. 143 Fed. Cl. at 129.

[3] After reviewing the briefing, we requested that plaintiffs submit to chambers an unredacted copy of counsels' billing records in an effort to expedite *in camera* review should that become necessary to our decision. Plaintiffs did so.

charged. Defendant also opposes the consulting/expert fees as beyond the scope of the sanctions allowed by Rule 37 and as otherwise unreasonable. We begin with the latter.

I.  Expert and Consultant Fees

Plaintiffs ask the court to award it $1,284,850 for what they call "incremental expert fees" expended on work by Mr. Myers and his associates. Assisting plaintiffs' expert was the firm of Tetra Engineering, a subsidiary of 4DD, which performed $836,955 in work analyzing or matching source code in order to allow plaintiffs to "determine likely RAM copies, clues to network topology, and other insights . . . only necessary due to the Government's spoliation . . . ." Pls.' Mot. for Fees 24 (ECF No. 203). Mr. Myers and his firm Eureka Software Solutions Inc. ("Eureka") then used that information along with their own analysis to opine on the likely number of copies of plaintiffs' software created by the agency.

As explained in our opinion granting spoliation sanctions, under Rule 37(e), the court may "order measures no greater than necessary to cure the prejudice" caused by the failure to preserve electronic evidence, and, if the offending party acted with intent to deprive, impose an adverse inference. RCFC 37(e)(1) – (2)(A) (2019). Earlier in Rule 37, the court is instructed to "require the party failing to act . . . to pay the reasonable expenses, including attorney's fees, caused by the failure." *Id.* § 37(d)(3) (mandating sanctions for unexcused failures to produce discoverable information requested under Rule 34). Both of those provisions are relevant here. Defendant both failed to preserve electronic information, as required by subsection (e), and as a result, failed to produce information required by Rule 34, thus mandating a monetary sanction under 37(d).

A.  Expert Fees and Costs Are Recoverable Under Rule 37

Defendant argues that the expert costs of Mr. Myers and Eureka are outside of the scope of Rule 37 because only attorney fees can be shifted under the rules. It also contends that such an award is unmerited under the court's inherent powers because we made no finding of fraud on the court nor did the agency's failures result in any other perversion of justice. Defendant urges that the work required of plaintiffs' expert, Mr. Myers, was largely the result of DHA's wiping of its servers, a failure that we previously found was only negligent, not intentional. It thus sees no nexus between any conduct that would arguably support an exercise of inherent powers and the conduct that caused plaintiffs to incur the fees of Mr. Myers and Tetra Engineering. The government thus concludes that, absent a reason sufficient to compel the exercise of the court's inherent powers, i.e., fraud or bad faith,

4

we are limited to awarding only attorney fees under the rules of the court. *See generally Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-46 (1991) (stating that the courts have the inherent power to shift attorney fees when bad faith is found). And, because the expert fees were expended as a result of negligence, the court should not shift the fees pursuant to its own authority to regulate proceedings before it.

We find no such limitation in the law. Neither the text of the rule nor any case law prohibits the shifting of expert fees as a sanction for discovery failures. Rule 37(d) states simply that attorney fees are among those that may be awarded as a sanction. It reads, in part, "the court must require the party failing to act . . . to pay the reasonable expenses, including attorney's fees, caused by the failure." RCFC 37(d)(3). Subsection (e) states that the court may order measures "necessary to cure the prejudice" suffered as a result of the failure to preserve electronic information. *Id.* § 37(e)(1). We found appropriate in our opinion on spoliation the shifting of these fees because of the government's destruction of evidence. 143 Fed. Cl. at 133. If plaintiffs tie the expert and consulting expenses to the government's failure to preserve and produce the electronic information, then fees are awardable under the rule.

Further, the cases defendant cited do not stand for the proposition it offers. The Supreme Court's decision in *Chambers* deals with, among other sanctions, the shifting of attorney fees under the courts' inherent powers to regulate the proceedings before them. *See, e.g.*, 501 U.S. at 45-46. It is silent as to the question of expert fees. Further, the Court's opinion merely lists, *inter alia*, the power to shift attorney fees when a party has acted in bad faith as one of the options at the disposal of the federal courts. *Id.* at 45. As Justice Scalia noted in his dissent regarding a different issue, the courts' inherent power to sanction litigants is not *per se* limited to circumstances of bad faith. *Id.* at 59 (Scalia, J. dissenting) (disagreeing with the majority's holding that the inherent powers to sanction reach beyond the confines of the litigation to punish conduct prior to the lawsuit) (citing *Redfield v. Ystalyfera Iron Co.*, 110 U.S. 174 (1884), as an instance in which bad faith was unnecessary to sanction a party).

The other cases defendant cited specifically deal with fee shifting statutes, which are, by their terms, limited to attorney fees. *E.g. W. VA Univ. Hosps., Inc. v. Casey*, 499 U.S. 83 (1991) (reversing a grant of expert fees pursuant to 28 U.S.C. § 1988). [4] Rule 37 is not so narrow. Subsection (e)

---

[4] Likewise, *Mathis* is of limited applicability here because, there, the Federal Circuit dealt with the application of, again, 28 U.S.C. § 1988. *Mathis v.*

5

allows the court to "order measures no greater than necessary to cure the prejudice." RCFC 37(e)(1). We found it necessary to shift the costs, including expert fees, resulting from defendant's destruction of evidence in order to cure the prejudice resulting therefrom. That is all that is required by the rule. Intent, or bad faith, is only required for the imposition of an adverse inference (or default judgment), which we also found appropriate here. RCFC 37(e)(2)(A). We find, in principle, that the inclusion of expert and consulting fees is appropriate in the spoliation sanction award to plaintiffs. The inquiry is not over, however. The fees claimed must also be reasonable and supported.

B. Whether the Claimed Expert Fees Are Reasonable

Expert fees awarded, like attorney fees, must be only those reasonably expended. *See Community Heating & Plumbing, Inc. v. Garrett*, 2 F.3d 1143, 1146 (Fed. Cir. 1993) (citing *Naporano Iron & Metal Co. v. United States*, 825 F.2d 403, 404 (Fed. Cir. 1987)). The court must be able to test the reasonableness via adequately documented, contemporaneous billing records. *Naporano*, 825 F.2d at 404. It is the party seeking fees that has the burden to substantiate them. *American Fed. Bank, FSB v. United States*, 74 Fed. Cl. 208, 221 (2006). It is not the court's duty to parse the application for fees to determine which are recoverable and which are not. *Id.* (citing *Naporano*, 825 F2.d at 405)).

Defendant balks at the number of hours and the adequacy of the factual support for them, namely a declaration submitted in support of plaintiffs' motion. The government also suggests that Mr. Myers' 593-page report, which took 14 months to author, is far beyond the scope of the work necessitated by the spoliation. It compares that product with that of its own expert, whose liability report is only 23 pages long.

Defendant also challenges the adequacy of the billing records for Mr. Myers as not identifying the tasks performed, who performed them, or when they were performed, in other words, wholly unlike the sort of billing records required of a request for attorney fees. Defendant also asserts that Mr. Myers' expert report on liability is not sufficiently tied to the missing evidence. Thus, in its view, the fees claimed for Mr. Myers are not

---

*Spears*, 857 F.2d 749, 758-59 (Fed. Cir. 1988). The *Mathis* court concluded that the district court's finding that the litigation was vexatiously prosecuted justified the inclusion of expert fees in the resulting sanction. As explained above, it is unnecessary to make a finding of fraud or bad faith to award expert fees under Rule 37.

reasonable and should not be awarded. At a minimum, defendant asks the court to defer ruling on the issue until after the evidence and issues are more developed. It points out that, at the time of briefing, defendant had not yet deposed Mr. Myers nor has the court heard him or seen his report.

Plaintiffs reply that the comparison of the breadth of the experts' work is inapposite because its own expert was forced to deal with a lack of solid information caused by defendant's own misdeeds. This hole in the record required a great deal of effort to fill, as explained in Mr. Myers' affidavit, argues plaintiffs. They point out that defendant did not submit any evidence to rebut Mr. Myers' declaration and thus argue that the government is in no position to question it.

Also relevant to the issue of the reasonableness of the fees is the adequacy of the supporting documentation showing the work performed. Plaintiffs' submitted an 18-page affidavit from Mr. Myers. In it, he describes his professional background, the purpose of his engagement in this matter, a general description of the work performed, the missing data, and a summary of steps taken to fill in the blanks caused by the absence of that data. Then he provides a summary of his and his firm's hours expended and an estimate of what those numbers would have been had the government preserved the relevant information sought. We have no issue with his representations regarding the latter (his estimate of hours expended if the government had not spoliated evidence). What is absent, however, from plaintiffs' materials are any contemporaneous billings or other records of the actual work performed. No invoices, diaries, checklists, bills, or any other type of hourly breakdown is offered, other than the gross totals listed in the declaration.

The court is left with a binary choice: to either accept Mr. Myers' gross totals of hours as reasonable and accurate and to assume that the cost was in fact billed and paid by plaintiffs or we must reject the claimed sum as wholly unsupported. Unfortunately, the record compels the second option. Defendant ought not to be forced to pay an enormous sum without any assurance that the work was in fact billed and paid for. We do not even know the rates that Mr. Myers and Eureka charged to plaintiffs. A general rate for all involved can be reverse engineered, but that is not the court's job.[5] In

---

[5] We decline the offer in plaintiffs' reply to supply invoices from Mr. Myers. Our prior instruction for plaintiffs to file a supported motion for fees and costs was not an invitation for an iterative process beyond the normal pattern of briefing. Plaintiffs had their chance to brief and support their request for fees. Other than the issues tied inextricably to the merits, the opportunity to support such a claim was with its motion for fees.

sum, we find the costs associated with Mr. Myers and Eureka to be unreasonable because there are no contemporaneous records to show how the charges were billed and paid.[6]

### C. Tetra Engineering's Labor Cost

The other type of non-attorney costs claimed are for hours expended by a subsidiary of one the plaintiffs, Tetra Engineering, which was hired by 4DD at the request of Mr. Myers and his firm.  Bennet McPhattter, the CEO of both companies, explained in his affidavit that Tetra Engineering was called on to analyze and simulate government source code contained in "packages" of data that remained after the destruction of files.[7]  Plaintiffs request $836,955 for the work, which represents 90% of the total hours billed by Tetra Engineering.  Mr. McPhatter explained that Tetra Engineering The reduced the fees by 10% in a prophylactic effort to avoid disputes.  *See* Pls.' Ex. 10 at 5.  The hours billed are supported by contemporaneous records in the form of invoices from Tetra Engineering to Mr. Myers' firm, Eureka.  Pls.' Mot. for Fees Ex. 11.  Those invoices include a description of the work performed, who performed it, and their hourly rates ($250-$350 per hour).

Defendant takes issue with these costs, which it describes as "pro se engineering services," because they are not the product of an arms-length transaction due to the subsidiary relationship between Tetra Engineering and 4DD.  It points out that the principals of both companies are the same and it argues that this arrangement was vulnerable to self-dealing.  As the government puts it, by "billing itself, there [were] no external constraints" on the costs expended.  Def.'s Resp. 39.  Further, plaintiffs do not allege that Tetra Engineering lost any opportunity for outside work in order to make time to perform services for Eureka.  Defendant also finds unconvincing the affidavit of Mr. McPhatter because it offers no analysis of what comparable outside experts would have charged.

In addition, defendant highlights the fact that Tetra Engineering charged 4DD more for its services than 4DD charged DHA for the 64 core-

---

[6] As explained below regarding the claim for the costs of Tetra Engineering, even if we were satisfied by the support for Mr. Myers' hours, we would defer ruling on their reasonableness because we find that question inextricably tied to merits issues.

[7] The packages of data remain because the government shared the data with 4DD during technical support requests, which were apparently not destroyed along with the other files.

8

license of its software that Immix sold the government. Defendant further argues that the billing records are insufficiently detailed for the court to assess whether the tasks performed and hours expended were reasonable. Finally, defendant again argues that these types of costs are unavailable as a sanction under the court's inherent powers because they were not necessitated by bad faith or fraud.

As we held above, we find such costs awardable under Rule 37. We also find that the billing records are sufficient to support the reasonableness of the hours expended. The billing records constitute contemporaneous invoices describing the work performed with sufficient detail to understand what was done and, in conjunction with Mr. McPhatter's declaration, why it was done. A more detailed drill down into the day-to-day tasks is unnecessary.

We also hold that the subsidiary relationship between Tetra Engineering and 4DD is not problematic. Although it is true that the arrangement between the two entities is not truly an arms-length transaction, we find the rate and hours reasonable. As explained by Mr. McPhatter, Tetra Engineering was created to bill purchasers of the Tetra software for support services needed. Thus, the arrangement used here is not unlike what plaintiffs would use in the open market with other clients. We also accept counsel's explanation in plaintiffs' reply brief that the use of Tetra Engineering for these services saved a great deal of time that would have been incurred by an outside vendor in learning the software and an understanding of the circumstances of this case.

What is lacking at this point, however, is a clear understanding of whether the effort expended by Tetra Engineering in support of Mr. Myers was the direct result of missing evidence. There are a number of issues that may be resolved by summary judgment, or eventually at trial, that would narrow the relevant scope of the expert's and consultant's work. The supporting declarations are unequivocal that Tetra's work was part of Mr. Myers' larger effort, unrelated to spoliation issues. If much of his and, by extension, Tetra Engineering's time was spent creating a record and then his own opinion on it, for a claim that has no legal basis, we would likely find that to have been an unreasonable expenditure of time and hence an inappropriate expense to shift to defendant. *See Hensley v. Eckerhart*, 461 U.S. 424, 435-36 (1983) (holding that the results achieved are relevant to whether a claimed fee was reasonable under Section 1988). We thus defer ruling on the fees claimed for Tetra Engineering.

II. Attorney Fees

Plaintiffs request $1,795,479 in attorney fees for services they argue were rendered as a result of defendant's destruction of evidence. Those fees are broken out into $1,333,380 of fees associated with discovery to assess and deal with the spoliation of evidence, $356,085 to bring the motion for sanctions, and $106,014 for preparing the present motion for fees. They are supported by declarations from current counsel, Mr. Silberfeld, billing records from his firm, Robins Kaplan, declarations from former counsel Rob Gilmore at Stein Mitchell, billing records from Stein Mitchell, a declaration from former outside counsel Howard J. Walsh, his billing records, and a declaration from another outside counsel, David M. Janet, on behalf of Fletcher, Heald, & Hildreth, and its billing records.

A chart on page 11 of plaintiffs' motion breaks down the fee request by individuals at each firm and by the category of work for the hours spent: additional discovery, the sanctions motion, and the present motion. The total hours for each category are as follows: 2437.46 hours for additional discovery; 540.94 hours to bring the motion for sanctions; and 155.57 hours to bring the motion for fees and costs. The reasonableness of the rates for these hours will be discussed separately later.

A. Additional Discovery

Plaintiffs break the "additional discovery" into two subcategories: 1) preparing for and taking additional depositions necessitated by the spoliation, and 2) "documentary work attempting to reconstruct the record." Pl.'s Mot. for Fees 12. We begin with the former.

1. Depositions

Plaintiffs explain that six depositions were necessary to "reconstruct the evidentiary record," *id.*, because defendant apportioned the topics concerning document preservation across five witnesses, one of whom had to be re-deposed, thus resulting in six depositions.[8] In addition, plaintiffs contend that it became necessary to use additional time during six other depositions to determine "how best to use [the remaining secondary evidence] to locate and count copies of TETRA created during the DMIX project." *Id.* at 13. Two such depositions were limited to questions "about

---

[8] We allowed plaintiffs to take a Rule 30(b)(6) deposition regarding the issue of document preservation and production. Defendant divided responsibility to testify on those subjects across five representatives.

what remaining evidence existed regarding copies of TETRA on SMS's servers." *Id.* at 14. Plaintiffs admit that they would have taken these six depositions regardless of spoliation, and thus seek only 50% of former counsel's (Stein Mitchell) associated time for preparing and conducting those examinations.

### 2. Reconstructing the Record

The bulk of the remaining hours apportioned for "additional discovery" are alleged to have been spent identifying the extent of the spoliation and documents that the experts used to reconstruct the record. Plaintiffs point out that they requested the number of software copies from the defendant in an interrogatory. Instead of an answer, they received five serial declarations from a defense expert, Mr. Calvin, that were ultimately inadequate for plaintiffs because the expert stated during his deposition that it was impossible to answer precisely because the evidence had been destroyed. Plaintiffs go on to summarize counsels' efforts in combing the documentary record of 2.3 million documents to assist Mr. Myers in his work to reconstruct and model how many copies of TETRA were installed on government-controlled computers/servers. Both former and present counsel charged hours for which plaintiffs now seek reimbursement under this category.

### B. Hours by Firm for Additional Discovery

Rather than follow the division in plaintiffs' fees motion of hours by subject, defendant organizes its opposition by firm and takes aim at the hours claimed for each. To account for work that would have been performed absent the destruction of evidence, plaintiffs reduced the hours claimed for Robins Kaplan attorneys by 40%. In addition, former counsel at Stein Mitchell explains that the firm "removed or redacted time entries outside the scope of the spoliation Order" and that plaintiffs have otherwise "not elected to seek all of Stein Mitchell's fees and expenses, either by excluding certain billing entries or by reducing the hours sought." Pl.'s Mot. for Fees Ex. 3 at 7 (Gillmore Decl.).

### 1. Stein Mitchell

As to the latter, defendant takes at face value counsel's representation regarding Stein Mitchell's attempt to exclude work not associated with the spoliation but asks the court to review *in camera* the billing records to check their reasonableness anyway, because defendant was allegedly unable to do so. It also urges the court to require plaintiffs to resubmit the request for

11

Stein Mitchell's hours because, although defendant agrees that the hours spent deposing the additional 30(b)(6) witnesses are attributable to spoliation, it avers that it was unable to parse the records sufficiently to extract only those hours from the others. Thus, it cannot say whether the total hours are reasonable for former counsel. The government also objects to recovery for any hours spent on the six depositions that would have been taken even if the agency had not destroyed evidence, arguing that those hours are insufficiently attributable to government lapses.

Plaintiffs reply that the records for Stein Mitchell are clear as to which hours correspond to which category of deposition. It argues that the court could extract the non-30(b)(6) deposition hours from its request if so inclined. More importantly, it argues that there is no need for such an exercise because the declaration of Mr. Gilmore draws the necessary linkage between the work done at those depositions and the spoliation. We agree on both counts.

We find no need to question the hours sought for Stein Mitchell. The billing records, although redacted in some instances, are detailed, and the entries for which reimbursement are sought appear on their face to correspond to the categories of additional discovery necessitated by the destroyed evidence. An *in camera* review of the unredacted records bolsters that conclusion. We also see the logical connection between the spoliation and the need to ask additional questions at deposition of fact witnesses. We thus grant plaintiffs' motion with respect to hours sought for Stein Mitchell spent on additional discovery.

### 2. Robins Kaplan

Defendant opposes all 1513.32 hours claimed for additional discovery performed by current counsel at Robins Kaplan because it believes those hours to be redundant of work already performed by previous counsel at Stein Mitchell: "All of this work, to the extent it was necessary, occurred prior to Robins Kaplan's retention by 4DD on October 28, 2019." Def.'s Resp. 15. It points out that former counsel took all fact depositions and avers that any document review and record assembly would have necessarily taken place prior to those depositions. Defendant continues that the only arguably necessary, additional work performed by current counsel would be that in assistance of Mr. Myers' efforts to deal with missing evidence, namely combing through the existing record and analyzing it for its usefulness in an effort to reconstruct the record.

The government argues that this same effort was also undertaken by former counsel at Stein Mitchell, citing to Mr. Gilmore's declaration affirming that former counsel spent many hours reconstructing the record. *See* Pl.'s Ex. 3 at 9-10. The review of Stein Mitchell's billings also reveals that former counsel charged hours in support of Mr. Myers' analysis. Defendant urges that current counsel's effort to sift through the produced documents is "facially duplicative of Stein Mitchell's work to 'reconstruct the record.'" Def.'s Resp. 16 (quoting Pls.' Mot. for Fees Ex. 1 at 7 (Silberfeld Decl.)). It also finds plaintiffs' 40% reduction in current counsel's hours to be insufficient and indicative of the duplication it alleges. The government thus concludes that the court has no reasonable way to discern which of current counsel's claimed hours were unnecessarily expended. The only result left to the court then, in defendant's view, is to disallow current counsel's "additional discovery" hours in their entirety.

Defendant also challenges the 1513 hours expended as unreasonably high by contrasting that total with the hours billed by Stein Mitchell for the additional discovery work, including the 30(b)(6) depositions and 50% for the other fact depositions, which total only 478.75 hours. Defendant points out that all of those hours were expended over two years, while current counsel's 1513 hours were billed during a period of only nine months. The result, in the government's view, is that the total hours billed by Robins Kaplan attorneys are far too high.[9]

Plaintiffs view the similarity between a number of its billing entries and former counsel's as supporting its broader point that the destruction of evidence has required an immense effort by all counsel, whenever involved, to deal with the holes in the record. They also point to Mr. Silberfeld's declaration and that of Mr. Myers to rebut the point that all of the factual review would have taken place prior to the fact depositions conducted by Stein Mitchell attorneys. They believe that the detailed billing records and 40% percent reduction in charged hours are more than sufficient for the court to make a finding of reasonableness. We agree.

Plaintiffs have submitted the best evidence available, detailed and contemporaneous billing records that are, on their face, sufficient to support a request for fees. We do not find the disparity in hours between former and current counsel of concern nor the similarity in categorization of billing

---

[9] Defendant also argues that plaintiffs' request for an extension of time to complete expert discovery reinforces its point. The additional nine months granted to allow current counsel to catch up should not be billed to the government as a sanction, it argues.

entries. Although it is possible that current counsel may have duplicated some of the effort previously undertaken, the 40% reduction made by plaintiffs is a reasonable proxy and assuages any concern we have in that regard.

### 3. Fletcher, Heald & Hildreth, PLC

Also claimed for additional discovery work are 54.39 hours billed by two attorneys at Fletcher, Heald & Hildreth. Hours were also billed to plaintiffs by these attorneys in support of the fees and sanctions motions, which will be discussed later. This firm has not entered an appearance in the case, a fact which is independently disqualifying in defendant's view. The government also takes issue with the support for these hours as not detailed enough to tell which hours were expended in support of the motions and which in providing legal advice regarding spoliation. Nor are they detailed enough, according to defendant, especially in light of redactions, to know whether the hours were properly attributed to these efforts.

In the declaration of Mr. Janet, partner at Fletcher, Heald & Hildreth, he explains that entries unassociated with either the legal advice regarding spoliation, or the two motions, were redacted from the contemporaneous billing records submitted (Pls.' Mot. for Fees Ex. 6). He also explains that, in addition to not seeking certain hours that might be disputed by defendant, Mr. Janet and his partner "reduced the hours and fees requested by 30% to account for composite or 'block billed' time entries that bill for tasks both within and outside the scope of the Spoliation Order." Pls.' Mot. for Fees Ex. 5 at 4.

We find no problem with the 54.39 hours billed by counsel at Fletcher, Heald & Hildreth. There is no legal principle preventing counsel at a firm that has not made an appearance on the docket from working on the case nor any rule which would exclude that work from being reimbursable should a sanction be warranted, as it is here. We also take no issue with the billing records, which were contemporaneous and detailed enough for the court to conclude that they were associated with the spoliation. *See, e.g.,* Pls.' Ex. 5 at 9 (entry for February 21, 2019: "Telecon w/Monty Myers . . . discuss issues re [redacted] and analysis by expert(s) and bases for damages"). As was the case with respect to the 40% reduction taken by Robins Kaplan, we find the 30% reduction reasonable for Mr. Janet and his firm. In sum, the hours claimed, except for the two motions, are all awardable.

4. Howard Walsh

Mr. Walsh was another former outside counsel for 4DD. Plaintiffs claim 391 hours billed by Mr. Walsh for document review and assisting counsel of record in preparing for depositions, which Mr. Walsh avers in his attached affidavit are attributable to the spoliation. Plaintiffs submitted Mr. Walsh's contemporaneous billing records, which reflect over 1600 hours billed from March 2017 to 2019. They are not nearly as detailed as the records kept by the firms previously addressed, however. *See* Pls.' Mot. for Fees Ex. 8. We agree with defendant that the billing records provide no basis on which the court can conclude from the 1600 hours billed to 4DD whether the nearly 400 claimed now are attributable to defendant's spoliation. The lack of detail and heavy abbreviation produce too opaque of a record to draw any conclusions. Nor does Mr. Walsh's declaration bootstrap the billings. We find the hours claimed by Mr. Walsh to be unsupported and thus unreasonable.

B. The Motions

The claimed cost of preparing the two motions, and arguing the first, is straightforward and bears no need for great explanation. Plaintiffs ask to be reimbursed for 508.6 hours spent by Stein Mitchell preparing for the sanctions motion and 101.3 hours for the fees motion. Plaintiffs also seek 32.34 hours related to the sanctions motion and 32.27 hours for the fee motion performed by counsel at Fletcher, Heald & Hildreth. Defendant counters that former counsel's billing records are insufficiently detailed to ascertain which entries correspond to these motions. Defendant also finds excessive the need to bill approximately 125 hours per partner for a sanctions motion that it argues plaintiffs were not entirely successful in, i.e., the request for default judgment was not granted. Lastly, defendant requests that we disallow $3,643.13 for legal research fees because plaintiffs have not established that such costs were in fact passed through to the clients. The 22 hours spent by current counsel on the motion for fees do not appear to be challenged.

Although we find the support for the hours in the billing records for the two motions, the total number of hours expended—over 540 hours billed for the sanctions motion and almost 156 hours for the fees motion—is, on the face of it, unreasonably high. Although we are sympathetic with the complexity faced and the extra hurdle of dealing with the lack of certain evidence, we are unconvinced that this difficulty should grant plaintiffs *carte blanche* in charging hours to the government for bringing those motions. *See Hensley*, 461 U.S. at 437 ("A request for attorney's fees should not result in

15

a second major litigation."). Almost 2438 hours are claimed for additional discovery resulting from spoliation, a figure that we take little issue with other than the unsupported hours of Mr. Walsh. But, spending nearly 700 hours, over a quarter of the time claimed for actual extra work, to support a sanction and quantify the time spent is disproportionate. *Cf. Coulter v. Tennessee*, 805 F.2d 146, 151 (6th Cir. 1986) (holding that the cost of bringing a fees motion should not exceed 3% of the hours in the main case). Seeking reimbursement for the wasted time should not replicate the problem. We reduce the hours reimbursed for bringing the two motions by 50%.[10]

On the issue of the legal research fees, we find them awardable. Regardless of whether they were passed through in the fee arrangement with plaintiffs, they are attributable to defendant's malfeasance, necessitated by the spoliation. We thus find it appropriate to reimburse plaintiffs for this category of expense.[11]

C. The Rates

The only issue remaining is at what rates the hours should be reimbursed. A table at pages 23-24 of plaintiffs' motion for fees details the rates billed, and what they would be under other fee schedules recently used by the court. Also reflected are the years of experience for each attorney and paralegal involved. Plaintiffs seek the actual rates billed because the comparison provided by its chart reveals that either the rates are generally below or within close proximity to the rates under the *Laffey* matrix or those recently awarded in *Campbell v. United States*, 138 Fed. Cl. 65 (2018).

Defendant opposes the rates proposed as either higher than the rates plaintiffs actually paid, as the records suggest, and because the rates claimed

---

[10] We note that, in a patent case of similar complexity to the one at bar, with a long and tortured discovery history, we recently reduced the hours for bringing a motion to compel, which resulted in the fee shifting sanction, by 50% from 80 to 40. *SecurityPoint v. United States*, No. 11-268C (Fed. Cl. Sept. 14, 2018) (ECF No. 372). Our sanction in that case was 50% of the cost of bringing the motion. Thus, the ultimate recovery was for 40 hours out of the 160 alleged to have been spent on the motion.

[11] Plaintiffs' motion also requests reimbursement of $25,141.20 for transcription and videography costs associated with the six additional depositions and 50% of those costs associated with the six other depositions for which plaintiffs' claim costs and fees. We find these costs properly associated with the spoliation and grant the motion with regard to them.

16

are in excess of its preferred matrices, the DC United States Attorneys' Office's adjusted *Laffey* matrix or the "Kavanaugh matrix," which represents another set of adjustments to the *Laffey* matrix based on the Legal Services Index ("LSI") component of the Consumer Products Index. Defendant also takes issue with rates claimed for two attorneys based in Los Angeles as above any of the rates in any of the matrices proposed by either party. Lastly, defendant argues that no finding of complexity supports an award of fees beyond its preferred matrices because the case is at an interim stage, the merits have not been reached, which is in contrast to the stage of litigation involved in the *Campbell* fees decision.

With regard to Stein Mitchell's claimed rates, we agree with defendant that the records indicate that, for some undisclosed reason, a 50% reduction was applied across the board in rates billed to the client. Plaintiffs' reply brief makes no attempt to explain this discount. Plaintiffs argue instead that a fee award is to be made at the market rate rather than the cost of providing services, or, in other words, if the fee arrangement provides for a less than reasonable rate, the court should award market rates. *See Blanchard v. Bergeron*, 489 U.S. 87, 93 (1989); *Blum v. Stenson*, 465 U.S. 886, 895-96 (1984). We disagree. This is not an instance in which counsel is discounting its rates to make them affordable to disadvantaged individuals or has agreed to a contingency fee that might otherwise cap the award of shifted fees. *See Blanchard*, 489 U.S. at 90. Nor is this a case brought by a public interest firm that is presumably otherwise not charging its client, as in *Blum v. Stenson*, 465 U.S. at 890-91. We find that awarding plaintiffs twice the rate actually billed by Stein Mitchell would be a windfall and would go beyond the purpose of the sanction ordered.[12]

As to the rest of the rates charged and requested, we find them reasonable as billed. They are congruent with the rates awarded in *Campbell* and those laid out in the adjusted LSI *Laffey* matrix. We have no doubt that the complexity of this case merits rates comparable to those in *Campbell*, especially given the extra challenges caused by spoliation. In most instances they are slightly above or slightly below those charged by counsel here. In the end, the result is reasonable, with a minor adjustment.[13]

---

[12] The same issue was present with the rates charged by Mr. Walsh. We do not reach the issue because we otherwise found his hours unsupported.

[13] With regard to Mr. Silberfeld, although based in Los Angeles, we find his 46 years of experience a sufficient reason to exceed the DC-based matrices' rates. Mr. Cohen, however, should be awarded at the *Campbell* rate of $490 per hour because his Los Angeles rate exceeds all of the rates offered by

17

CONCLUSION

In accordance with the foregoing, the following is ordered:

1. Plaintiffs' motion for fees is denied with regard to Mr. Myers because his fees are unsupported and thus unreasonable.

2. We defer ruling on the fees charged by Tetra Engineering.

3. We grant plaintiffs' motion as to the number of hours associated with additional discovery, except with respect to Mr. Walsh, whose hours are unsupported.

4. We grant plaintiffs' motion in part as to the hours associated with bringing the motions for sanctions and fees. Plaintiffs will be awarded 50% of the cost of bringing those motions.

5. The rates to be awarded will be those billed, including former counsel's discount to the client, with the exception of Mr. Cohen.

6. Plaintiffs' motion is granted with respect to the legal research and deposition costs claimed.

7. The parties are directed to consult and file a status report on or before April 16, 2021, proposing, jointly if possible, a sum for award of fees and costs consistent with this opinion.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

---

either party and his three years of experience provide no other reasonable basis to exceed the alternative DC rates offered by the parties.