# In the United States Court of Federal Claims

No. 15-945C
(Filed: March 31, 2022)
(Re-Filed: April 20, 2022)[1]

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

4DD HOLDINGS, LLC, and
T4 DATA GROUP, LLC,

                        *Plaintiffs*,

v.

THE UNITED STATES,

                        *Defendant*,

and

IMMIX TECHNOLOGY, INC.,

                        *Third-Party*.

| |
|---|
| Copyright infringement; FAR 52.212-4; FAR 52.227-14; DFARS 252.227-7013; conditions versus covenants; license; implied-in-fact license; accord and satisfaction; release; 17 U.S.C. § 117(a) (2018) |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Roman M. Silberfeld*, Los Angeles, CA, with whom were *Ronald J. Schutz*, *Christopher K. Larus*, *Bryan J. Mechell*, *Christine Yun Sauer*, *Jessica Gutierrez Alm*, *Zac Cohen*, *Holland Hauenstein*, Minneapolis, MN, for plaintiff, 4DD Holdings, LLC, and T4 Data Group, LLC.

*John J. Todor*, Senior Trial Counsel, United States Department of Justice, Civil Division, with whom were *Brian M. Boynton*, Acting Assistant Attorney General, *Martin F. Hockey, Jr.*, Acting Director, and *Elizabeth M. Hosford*, Assistant Director, for defendant.

---

[1] This opinion was originally issued under seal in order to afford the parties an opportunity to propose redactions of the protected material. The parties agreed that none were necessary; thus it appears in full.

<u>OPINION</u>

This is an action for copyright infringement.  Pending are the parties' cross-motions for summary judgment.  4DD Holdings, LLC, and T4 Data Group, LLC ("4DD" or "plaintiff"[2]) seek partial summary judgment on their claim that the government violated their copyright by over-installing copies of its computer program, TETRA.  Plaintiff claims that it had a valid copyright, that the license at issue prohibited additional copying beyond what it explicitly allowed, that additional copying of TETRA would be a copyright violation, and finally, that the government made a certain number copies of the software.  The government also seeks summary judgment, claiming that 4DD waived the right to additional compensation for additional copies of TETRA through a release executed as part of a modification to the contract.  In the alternative, the government claims that, under copyright law, it was entitled to make most of the additional copies of TETRA for which plaintiff now seeks compensation.

The issues are fully briefed, and oral argument was held on January 28, 2022.  We grant in part and deny in part plaintiff's motion, and we deny in full defendant's motion.

BACKGROUND[3]

Since the late 1990s, both the Department of Defense ("DoD") and Department of Veterans Affairs ("VA") have had difficulty in linking their respective databases of millions of healthcare records of servicemembers, veterans, and their beneficiaries.  Beginning in 2011, the DoD and VA sought to jointly rectify those problems and achieve greater data federation, entering into a program known as the integrated Electronic Health Record ("iEHR").  In 2013, the DoD and VA elected to develop their own answer to the data federation problem and began the Defense Medical Information Exchange ("DMIX") project.  That same year the government conducted a build versus buy analysis and elected to buy a commercial solution rather than build its own federation software.  A government contractor, Systems Made Simple, Inc. ("SMS"), brought on to assist the government with the DMIX project, selected 4DD and one other finalist from a host of solutions to compete in a flyoff, which 4DD subsequently won.

---

[2] Although there are two named plaintiffs, we will refer to them as one plaintiff and use a singular pronoun.

[3] The facts have been taken from the complaint and the exhibits of the motions for summary judgment.

4DD is a veteran-owned small business whose primary business is developing and licensing software, including the software at issue, TETRA. TETRA Healthcare Federator contains a suite of components (collectively referred to as "TETRA") designed to enable federation between databases, the main goal of the DoD and VA.  TETRA Enterprise Studio is an interface which a user employs to "instruct the TETRA Healthcare Federator components what data to use and how to manipulate the data."  Pl.'s Mot. at 5 (citing Ex. 3, McPhatter Dep. p.22:7-10).  On September 26, 2013, the government and ImmixTechnology, Inc. ("Immix"), a 4DD reseller, entered into a contract to license 64 cores[4] of TETRA and 50 seats[5] of TETRA Enterprise Studio.  Government contractors, such as SMS, were to oversee the implementation and configuration of TETRA and TETRA Enterprise Studio for the government's use.  The installations were to take place at the Development and Testing Center ("DTC"), a government facility in Richmond, Virginia, and SMS's lab.

One month after performance began, the parties executed a modification to the contract.  While the original contract incorporated 4DD's End User License Agreement ("EULA") by reference through an Immix Sales Quotation, this modification expressly included the EULA in the contract.  The EULA contained a number of restrictions on the government's use of TETRA, such as limiting the number of copies the government could

---

[4] According to plaintiff:

> TETRA Healthcare Federator is optimized to run on a server, but may be installed on any type of device, including laptops, servers, and virtualizations of computer systems called "virtual machines" ("VMs").  4DD therefore licensed TETRA Healthcare Federator on a "per core" basis to account for the computing power available to each copy of TETRA on a machine. For example, under this "per core" license for up to 64 cores, the Government could make 16 copies of TETRA on four-core VMs (64 total cores) or, it could make four copies of TETRA on 16-core VMs (64 total cores).

Pl.'s Mot. at 8 (citations omitted).

[5] A per-seat license limits TETRA Enterprise Studio by the user.  "*One* seat allows *one* user to access that copy of TETRA Enterprise Studio."  Pl.'s Mot. at 24 (citing Ex. 5) (Emphasis in original).

make, how the government could use TETRA, and forbidding any distribution of copies of TETRA. However, while the EULA prohibited more than one backup copy for the government, 4DD was not permitted to track copies of TETRA that the government or SMS installed. This was because the government forbade activation of a "phone home" feature, which could have allowed 4DD to track installs and executions of TETRA. Instead, the parties agreed that the government would use a license portal created by 4DD to track each download of TETRA.[6]

While the government was implementing TETRA, 4DD became aware that a number of unauthorized copies had been made. In February 2014, 4DD estimated that there were 10 extra cores of TETRA in use and notified SMS. Def.'s Resp. at 4 (citing Ex. H). Government officials were aware, however, that there were over-installations of copies of TETRA, and the agency subsequently ordered them deleted. In August 2014, 4DD contacted the government to discuss the over-installations, attaching a spreadsheet from the portal showing more than double the number of cores allowed had been installed. The Defense Health Agency ("DHA") and 4DD then began true-up negotiations to settle the over-installations. This process began in September 2014, and thereafter, the DHA continued to remove copies of TETRA.

In December 2014, the parties agreed that 168 extra cores had been installed, which resulted in a modification of the contract in March 2015. This modification, which led to a payment by the government of $1.7 million for those cores, contained a release: "In consideration of the modification agreed to herein, the contractor hereby releases the Government from any and all liability under this contract for further equitable adjustments attributable to such facts and circumstances giving rise to this particular modification. All other terms and conditions remain unchanged." DHA then discontinued the use of TETRA in 2014, opting to "leverage and consolidate the existing legacy software DHA already possessed. . . to provide the interoperability of DoD and VA data." Def.'s Mot. at 11. The contract between 4DD through Immix and the government expired "at the conclusion of the term of the March 2015 contract modification." *Id.*

---

[6] The government was clearly aware of 4DD's reliance on it to accurately track the installations of TETRA. *See* Pl.'s Mot., Ex. 19 (Email from Sheila Swanson to 4DD's CEO, Bennett McPhatter, ensuring that the government is tracking TETRA accurately and stating, "Thank you, by the way for trusting us!").

Following the true-up modification, 4DD instituted this action for copyright infringement for the government's unauthorized copying of TETRA in August 2015. During discovery, plaintiff brought a motion for sanctions, arguing that the government destroyed relevant evidence of over-installation it had a duty to preserve with the intent to deprive plaintiff of the evidence. We agreed, finding that (1) "[t]he agency deleted instances of TETRA during the true-up period without informing 4DD," (2) "[t]he agency destroyed the DTC servers' hard drives," and (3) "[t]he agency erased all the information on many laptops used on the DMIX project." *4DD Holdings, LLC v. United States*, 143 Fed. Cl. 118, 130 (2019).

We found that government officials engaged in spoliation with respect to all three categories. The government had a duty to preserve the evidence at issue due to "pending or reasonably foreseeable" litigation but did not do so. *Id.* Consequently, we awarded plaintiff "fees and costs for bringing this motion and conducting additional discovery necessary to assess and ameliorate the government's spoliation." *Id.* at 133. We further held that "the government w[ould] be precluded from arguing that evidentiary gaps created by its spoliation should be construed in the government's favor." *Id.*

We also considered whether we should draw inferences adverse to the government from the spoliation. As to the first and third categories of spoliation, we found that the government deleted the relevant evidence with the intent to deprive 4DD of its use, allowing us to draw the inference that the deleted evidence would be unfavorable to the government. For the second category, though, we found that although relevant evidence was destroyed, it was not done through a "pattern of willful behavior," but as a result of a regular decommissioning process wherein the hard drives were shredded. *Id.* at 134. Although the evidence should have been preserved, those responsible for decommissioning the hard drives did not receive notice in time. While negligent, this communication failure was not intentional, and we rejected applying adverse inferences against the government for it. We reserved the right to determine the effect of our holding on later proceedings.

## DISCUSSION

I.   Plaintiff's Motion for Summary Judgment

A. Plaintiff's Copyright

The first step of 4DD's motion is its request that we find as a matter of law that it has a valid copyright for TETRA. The government concedes the matter, and so we find that 4DD has a valid copyright for TETRA.

B. Contract Language Prohibits Copying

The second element of plaintiff's motion is a ruling that the license explicitly limits the number of copies the government could make of TETRA: 232 cores of TETRA, 50 seats of TETRA Enterprise Studio, and 1 backup copy. Specifically, the EULA provided that the government "may not copy" TETRA. Plaintiff thus seeks a ruling that the EULA prohibits copies beyond the fixed number (plus one backup) allowed by the license. Plaintiff further seeks clarification that this restriction constitutes a condition precedent to the license, and that it is not a covenant, thereby allowing plaintiff to bring a claim for copyright infringement.

While the government concedes the application of the EULA, it contends that there are several reasons the EULA's restrictions do not prevent whatever additional copying occurred.[7] The initial argument we can readily dismiss. The government contends that the EULA was incorporated after the license was entered into and that any extra copies made before the EULA was incorporated should not be counted. The EULA was incorporated by reference in the original contract prior to the modification, however, and we see no basis for not deeming it to be effective.

We turn now to the remaining arguments the government aims at the effectiveness of the EULA. First, according to the government, an "order of precedence" clause in the EULA gave priority to government rules and regulations in the event of a dispute between contract terms and rules and regulations, allowing the government to make backup copies. Second, the government adds that a Professional Services Agreement ("PSA") included with the EULA allowed the government to make backup copies of TETRA. Third, the government contends that a subcontract entered into between 4DD and SMS also allowed for backup copying. Finally, the government argues that an implied-in-fact license from the parties' course of dealing allowed the government to make backup copies and copies that were essential for the use of TETRA.

---

[7] Some of these arguments reappear in the government's own motion for summary judgment. To the extent that the arguments are the same, we respond to them in the section covering the government's motion.

1. Government Counterarguments

   a. The Order of Precedence Clause

The government argues that FAR clause 52.212-4, incorporated into the contract through the October 28, 2013 modification, mandated the creation of backup copies of TETRA pursuant to federal rules and regulations. The clause states:

> *Order of precedence*. Any inconsistencies in this solicitation or contract shall be resolved by giving precedence in the following order: (1) the schedule of supplies/services; (2) The Assignments, Disputes, Payments, Invoice, Other Compliances, Compliance with Laws Unique to Government Contracts, and Unauthorized Obligations paragraphs of this clause; (3) the clause at 52.212–5; (4) addenda to this solicitation or contract, including any license agreements for computer software; (5) solicitation provisions if this is a solicitation; (6) other paragraphs of this clause; (7) the Standard Form 1449; (8) other documents, exhibits, and attachments; and (9) the specification.

FAR 52.212-4(s) (Emphasis in original). The "Other Compliances" in FAR 52.212-4(s)(2) refer to "all applicable Federal, State and local laws, executive orders, rules and regulations." FAR 52.212-4(q). The government therefore argues that copies of TETRA made pursuant to the various Standard Operating Procedures ("SOPs") cited by plaintiff were permitted because the SOPs, as rules and regulations under "Other Compliances," trump provisions in the EULA, as a "license agreement for computer software."[8]

Plaintiff correctly points out, however, that this clause applies to inconsistencies between the explicit terms of solicitations or contracts.[9] We

---

[8] For example, the DTC's SOPs, according to the parties, mandated the "routine creation of . . . backup copies throughout the project." Pl.'s Mot. at 22 (citing Ex. 57, MHS DTC Backup and Recovery Dot Mil Network Standard Operating Procedures (SOP)). Specifically, the SOPs "outline[] the procedures for configuring, performing, and validating the backup of DTC Management Infrastructure." Ex. 57, APP-1256.

[9] Plaintiff also argues that the SOPs are not "rules and regulations" under FAR 52.212-4(q)'s "Other Compliances." We need not reach that issue, however, as we find the clause inapplicable to the facts.

agree with plaintiff that the clause is inapplicable to the facts of this case. The "order of precedence" clause clearly refers to inconsistencies in the language of a contract. The clause states at the outset that it governs when there are "[a]ny inconsistencies *in* this . . . contract." FAR 52.212-4(s) (Emphasis added). Any inconsistency must be within the four corners of the contract. *See, e.g.*, *Apollo Sheet Metal, Inc. v. United States,* 44 Fed. Cl. 210, 214 (1999) ("One thus looks to the order of precedence clause to resolve inconsistencies between *specific terms* in competing clauses of like provision. . .") (Emphasis added); *Manuel Bros., Inc. v. United States*, 55 Fed. Cl. 8, 37 (2002) ("The Order of Precedence clause generally is relied on to resolve conflicts *between clauses* of the contract.") (Emphasis added). The conflict here, according to the government, is between the language of the EULA and the SOPs; however, the SOPs do not appear in the EULA, and so there can be no conflict in the terms of the contract. Therefore, the order of precedence clause has no bearing in this dispute.

b. Professional Services Agreement

Next, the government responds that the PSA between 4DD and the government allowed for the government's backup copying of TETRA. The government argues that DFARS clause 252.227-7013, incorporated into the PSA, permitted the copying.[10] The government then contends that if DFARS 252.227-7013 does not permit copying, then it is because the contract is contradictory and should be read in favor of the government. Finally, the government argues that, in the alternative, we should read DFARS 252.227-7014 into the contract instead of DFARS 252.227-7013, and that this clause would also permit the government's backup copying.

Plaintiff replies that the PSA is inapplicable to the current dispute for a variety of reasons. First, the PSA only applies to "software consulting and professional services," and the creation of new software executed through purchase orders for 4DD, which did not occur here.[11] Further, plaintiff

---

[10] The government also cites FAR clause 52.227-19 for the same reason. The PSA, however, says that FAR 52.227-19 is applicable when the customer is a non-DOD Federal agency. Here, the customer was a DOD agency, so this FAR provision is inapplicable.

[11] Although whether services were actually provided by 4DD is a disputed fact question, it is not material. 4DD claims that it never provided services to the government, while the government points to a Contract Line-Item Number ("CLIN") for support services for the proposition that services were provided. However, whether services were actually provided has no bearing

claims that Immix did not have the authority to enter into a PSA for 4DD.[12] Finally, it claims that the regulations cited by the government in the PSA did not permit the government's copying of TETRA.

We agree with plaintiff that the PSA does not allow the government's alleged over-installation of TETRA for backup purposes.   The PSA's pertinent provision, section 5.5, says:

> [I]f 4DD Software and/or Developed 4DD Software are provided to the Department of Defense (DoD), such 4DD Software and/or Developed 4DD Software (as applicable) are classified as "Commercial Computer Software," and the Government is acquiring only "restricted rights" in such 4DD Software and/or Developed 4DD Software (as applicable) (including, without limitation its related Documentation and fonts) as that term is defined in Clause 252.227-7013(c)(1) of the Defense Federal Acquisition Regulation System ("DFARS").

Pl.'s Mot., Ex. 17, APP-0525.   As the government points out, there is no paragraph (c)(1) in DFARS 252.227-7013.   Further, there are no "restricted rights" referenced in DFARS 252.227-7013.   Because the clause as a whole discusses the rights the government acquires in technical data when licensing software, and because there are no "restricted rights" referred to in DFARS 252.227-7013, the government points us to "limited rights" under that subsection.   Limited rights give the government a variety of rights, including the right to "reproduce . . . technical data," seemingly allowing it to copy TETRA.   DFARS 252.227-7013(a)(14).   This construction, however, ignores the definition of "technical data" in DFARS 252.227-7013.   The clause explicitly states that "[technical data] does not include computer software." DFARS 252.227-7013(a)(15).   Even having limited rights in technical data would therefore not give the government the right to copy TETRA.

The government also made an argument during oral argument, not present in its briefs, that the PSA is contradictory and should be read in favor of the government.   The government argues that the PSA gives the government limited rights "in such 4DD software," which includes the right to copy.   The inclusion of DFARS 252.227-7013's definition of technical

---

on our holding.

[12] We need not reach this issue either, as our holding on the PSA rests on other grounds.

data, however, would exclude TETRA from the limited rights the government would enjoy. The contradiction lies in the fact that the government is specifically granted limited rights in TETRA according to the contract, but those rights are also curtailed by the definition of technical data. Because the contract was written by 4DD, the government argues, it should be construed against 4DD and read in favor of the government. We find this argument unavailing.

A basic principle of contract construction is that the contract must be read in its entirety so as not to render any provision meaningless. *NVT Tech., Inc. v. United States*, 370 F.3d 1153, 1159 (citing *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)). Section 5.5 states that "the Government is acquiring only 'restricted rights' in such 4DD Software . . . (as applicable) (including, without limitation its related Documentation and fonts) *as that term is defined*" in the DFARS. (Emphasis added). If we look to limited rights in the clause instead, as the government suggests, the definition of limited rights, as stated above, does allow copying of *technical data*, but technical data does not include computer software. That is the clearest reading of the PSA.

In any event, the above-quoted portion of section 5.5 is not internally inconsistent. The government would have limited rights in TETRA's documentation and fonts, along with technical data, which includes "recorded information, regardless of the form or method of the recording, of a scientific or technical nature (including computer software documentation)." The most harmonious reading of section 5.5 would give the government limited rights in TETRA's technical data, as allowed by section 5.5, in a way that is consistent with the definition of both terms in the clause.

Section 5.5 must also be read in harmony with the rest of the PSA. Section 5.1 of the PSA explicitly states, "[The Government] shall not . . . copy any 4DD software . . . except as expressly provided in a separate software license agreement between the parties." Here, a software license agreement between the government and 4DD expressly restricted the government's copying to one backup copy. When read in conjunction with section 5.5, the PSA clearly says that TETRA shall not be copied and that the government would only have the rights it would normally have under DFARS 252.227-7013, which does not include the right to copy software.

Finally, the government argues that another regulation potentially allows it to copy TETRA for backup purposes. "Restricted rights" are defined in DFARS 252.227-7014, which, if it were applicable, would allow

the government to "[m]ake the minimum number of copies of the computer software required for safekeeping (archive), backup, or modification purposes." DFARS 252.227-7014 appears nowhere in the PSA, however, and it is not incorporated by reference. Further, section 5.5 of the PSA also explicitly says that 4DD's software is commercial software, and restricted rights under DFARS 252.227-7014 apply only to "noncommercial computer software."[13]

### c. The SMS Subcontract

Next, the government responds that the subcontract plaintiff entered into with SMS allowed portions of the government's copying. FAR clause 52.227-14, which was incorporated into the subcontract between SMS and 4DD, states, in its pertinent part, that TETRA could be "[r]eproduced for safekeeping (archives) or backup purposes." FAR 52.227-14, Alternate III, Restricted Rights Notice(b)(3). The government specifically quotes the "Restricted Rights Notice" in the Alternate III version of FAR 52.227-14, which was also incorporated into the subcontract. This notice informs the government of the rights it has in computer software.

While the government is correct that this notice gives it the right to reproduce software, the government also ignores an earlier paragraph in the notice that clearly limited SMS's rights to make copies of TETRA for backup purposes. It states, "[TETRA] may not be used, reproduced, or disclosed by [SMS] except as provided in paragraph (b) of this notice or *as otherwise expressly stated in the contract*." FAR 52.227-14, Alternate III, Restricted Rights Notice(a) (Emphasis added). While paragraph (b) of the notice allows backup copying, the subcontract between 4DD and SMS explicitly states that SMS could make only one copy of TETRA "for archival purposes." Pl.'s Reply, Ex. 84. The contract, therefore, controls according to FAR 52.227, and SMS could not copy TETRA except for one copy for backup purposes.

### d. Implied-in-Fact License

Finally, the government argues that the government had an implied-in-fact license to "make backup copies and other copies that were essential for the use of TETRA." Def.'s Mot. at 35–36. It contends that 4DD and other offerors were aware that any federation software would be used in a

---

[13] Although DFARS 252.227-7013 is titled "Rights in Technical Data—Noncommercial Items," the "limited rights" provision does not apply only to noncommercial computer software, unlike DFARS 252.227-7014. And again, DFARS 252.227-7013 is in the PSA.

developmental environment, which 4DD should have understood would require multiple backup and other essential copies and configurations of TETRA during its integration.[14]  Further, according to the government, 4DD never sought compensation during the true-up process for any backup copies, only active installations, reinforcing that 4DD was not concerned with backup copies.[15]  Lastly, the government says that the license tracker set up by 4DD to replace the phone home feature only focused on "running installations" of TETRA, not copies.  With those facts taken together, the government argues, 4DD was not concerned about backup copies, and it "either knew or should have known about the backup procedures in effect for the project and explicitly or implicitly agreed to follow them," creating an implied-in-fact license.  *Id.* at 38.

Plaintiff takes the position that an implied-in-fact license cannot exist when, as here, there is an express written contract.  Further, according to plaintiff, there could be no implied-in-fact license because there was no meeting of the minds due to the government's "concealment and destruction of evidence."  Pl.'s Reply at 6.  It also argues that the government should not be allowed to benefit from its own spoliation.  It is unnecessary to consider the latter argument, as we agree that the EULA precludes a finding of an implied-in-fact license.[16]

---

[14] The government points to multiple steps in the solicitation to show that 4DD was aware that TETRA would be used in a developmental environment, requiring the use of backup and other essential copies.  For example, a Request for Quote the government sent to 4DD explained that the government was "developing and implementing an integrated Electronic Health record. . . system," and the chosen contractor's software was "needed to support [the government]'s requirements."  Def.'s Resp. at 37 (ex. PPP).

[15] The government cited the deposition of 4DD CEO, Bennett McPhatter for the proposition that it would be reasonable for the government to make multiple backup copies during this project.  4DD disputes this characterization of the deposition.  Mr. McPhatter testified that it was reasonable to create backups of a "TETRA package," not the object code.  Only the latter would constitute a copy, according to 4DD.  According to Mr. McPhatter's deposition, packages are akin to a savable document like a spreadsheet; different than copying a program's object code.

[16] The government repeatedly uses the existence of an implied-in-fact license in other arguments in its response.  To the extent the government uses the existence of an implied-in-fact license, we reject those arguments.

The Federal Circuit in *Bitmanagement Software GmBH v. United States* stated the baseline rule for implied-in-fact licenses: "It is well established that 'the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter, unless the implied contract is entirely unrelated to the express contract.'" 989 F.3d 938, 949 (Fed. Cir. 2021) (quoting *She Ahn Lee v. United States*, 895 F.3d 1363, 1370 (Fed. Cir. 2018))... The Federal Circuit nevertheless found an implied-in-fact license in *Bitmanagement*. The court deviated from the general rule for three reasons. First, the parties there did not have a contractual relationship, instead using an intermediary which could not bind Bitmanagement. Second, the issue in the case was not expressly dealt with by the contract. Finally, the contract was ambiguous with respect to how the parties understood that the software would be used.

The same rationale for an exception does not apply here. First, although the parties in this case were not in an express contractual relationship themselves, Immix did have a contract with the government, and Immix was an authorized reseller of TETRA for 4DD and could bind 4DD. Next, the topic at issue here, copies of TETRA, *was* expressly dealt with in the EULA. The EULA provided that the government could not copy TETRA beyond what was allowed in the EULA. Finally, although the government argues that 4DD knew how the government would use TETRA in a developmental environment, the EULA is not ambiguous with respect to limitations on TETRA's use. It specifically laid out the number of cores, seats, and copies the government could make of the various software. We see no reason to deviate from the baseline rule that an implied-in-fact license is inapplicable when there is an express contract that deals with the same issue.

2. Conditions v. Covenants

The second part of plaintiff's argument in this subsection of its motion is that the EULA's prohibitions on copying constituted conditions precedent, allowing it to bring its copyright infringement claim. The Federal Circuit has held that:

> Normally, a copyright owner who grants a license to his copyrighted material has waived his right to sue the licensee for copyright infringement and must instead pursue a claim for breach of contract. "If, however, a license is limited in scope and the licensee acts outside the scope, the licensor can bring an action for copyright infringement." Whether a licensee acts outside the scope of a contract by failing to comply with a term

of the parties' agreement turns on whether that term is a condition that limits the scope of the license or is merely a covenant.

*Bitmanagement*, 989 F.3d at 950 (internal citations omitted).  In other words, if the prohibitions on copying are covenants, plaintiff is limited to a breach of contract action; only if they are conditions precedent can plaintiff bring an action for copyright infringement.  "Terms of a license or contract are presumed to be covenants, rather than conditions, unless it is clear that a condition precedent was intended." *Id.* (citations omitted).

Plaintiff seeks summary judgment that the prohibitions on government copying are conditions precedent, not covenants, allowing it to bring a claim for copyright infringement.  Plaintiff points to multiple examples of cases and courts finding that specific provisions in licenses were conditions precedent, and then it compares those provisions' language to the EULA's language to show that the EULA contained conditions precedent, allowing plaintiff to bring a claim of copyright infringement.

The government does not squarely challenge plaintiff's argument.  Instead it contends that the issue is moot because of what it asserts is the implied-in-fact license to allow use beyond the EULA restrictions.  We have already established, however, that an implied-in-fact license does not exist.  Plaintiff noted in its reply that the government makes no other argument to establish whether the EULA contained conditions precedent or covenants on copying, but that is not entirely accurate.  While difficult to parse from the government's response, the government appears to argue that, because *Bitmanagement's* facts differ from the current facts, we should not find that there was a condition precedent here.

In *Bitmanagement*, the Federal Circuit held that the implied-in-fact license at issue had a condition precedent for the government to use a tracking program to limit the number of users that would have access to the copyrighted software.  The government exhaustively points out how there was no tracking method suggested or implemented to track backup or RAM copies, but the government does not adequately explain how the lack of a tracking condition in this case affects plaintiff's motion.  Plaintiff is not arguing that there was a tracking condition in the license but that there was a condition against copying and exceeding the EULA's limits, and the government does not challenge that assertion.  Instead, the government appears to be using this section again to bolster its argument that there was

14

an implied-in-fact license for the government to make multiple backup copies, an argument we have rejected.[17]

We find that the EULA contained conditions precedent, allowing plaintiff to bring its copyright infringement claim.

### C. Copying in Excess of EULA

Next, plaintiff seeks summary judgment that if the government exceeded the EULA's limits, then the excess copying would constitute copyright infringement. It argues that the EULA was unambiguous in its prohibition of excess copying, a statement with which we already agreed, as stated in the above section. Plaintiff then contends that if the government did copy in excess of the EULA, then it would constitute copyright infringement under the Copyright Act. Finally, plaintiff argues that different types of copies the government made, if they exceeded the EULA, are infringing, an argument that largely mirrors the plaintiff's overall thesis of this section.

The government's response presents numerous disagreements with plaintiff's arguments, but it largely does not set forth new legal arguments.[18] The government's new argument that pertains to this section is that copies that are nonfunctional should not be counted as infringing, but this argument does not rely on any legal authority.[19]

Plaintiff first points to the Copyright Act's reservation of the right to "reproduce the copyrighted work in copies" or authorize such reproduction in the copyright holder. The government does not appear to dispute this

---

[17] The government repeats many of its arguments already made in the same subsection, such as how 4DD did not track backup copies or how 4DD did not seek compensation for backup copies during the true up negotiations.

[18] Any legal arguments the government set forth in response to plaintiff in this section have already been addressed earlier, such as the government arguing that an implied-in-fact license should have foreclosed a finding of copyright infringement for some types of copies.

[19] The government also argues that 4DD's measure of copies is different from how it presented its count during the true up negotiations. Plaintiff disputes this characterization, but we need not rule on this argument by the government as our holding rests on other grounds.

assertion.  We agree that the Copyright Act prohibits copying TETRA beyond what 4DD authorized in the EULA.[20]

Plaintiff then argues that the various types of copies the government made would constitute copyright infringement if those copies exceeded the EULA.  First, plaintiff argues that copies of TETRA made during the software development life cycle ("SDLC")[21] resulted in numerous types of copies, all of which were infringing once the government exceeded the EULA.  Plaintiff also contends that Random-Access Memory ("RAM") copies of TETRA constituted infringing copies once the government exceeded the license.  Plaintiff then argues that any copies of TETRA Enterprise Studio that exceeded the EULA's limits were infringing as well. Finally, plaintiff argues that any backup copies that exceeded the EULA were also infringing.  In each explanation of the types of copies, plaintiff repeats the hypothetical with which it began this portion of the argument: if any of those copies exceeded what the EULA prescribed, each subsequent copy would constitute infringement.

The government argues that nonfunctional types of copies cannot be infringing.  The government's expert, Ronald Schnell, disagrees with plaintiff's expert, for instance, as to whether to treat nonfunctional copies of TETRA as infringing.  Mr. Schnell claims that, as a "matter of computer science," only functional copies should be considered infringing, and Mr. Myers, the plaintiff's expert, had entire categories of copies that were nonfunctional that he counted as infringing.

Plaintiff replies that neither the Copyright Act nor the EULA restrict the limit on copying to functional copies.  Plaintiff then points to two cases,

---

[20] Our ruling, however, does not resolve the question of what *exactly* a copy of TETRA or TETRA Enterprise Studio is, as neither party squarely presents it in their motions and the question is not necessary for our ruling.

[21] The SDLC is a "process implemented by the government with the goal of efficiently moving software through the complex phases of, among other things, planning, development, integration, testing, and deployment of software."  Pl.'s Mot. at 15 (citing Ex. 27).

one from the Sixth Circuit[22] and one from the Court of Federal Claims,[23] to argue that the number of copies is the issue, not whether they were functional. The government presented no legal arguments in response.  We must note, however, that these cases do not address the functionality of copies.  They focus their analysis on the number of copies made versus used; functionality is not considered.

We are not satisfied that there has been sufficient factual development of the record to rule on this portion of plaintiff's motion.   We are persuaded that ruling on this issue with no real understanding of how the government undertook to utilize the copyright, in particular the more technical aspects of what the alleged copies consisted of,[24] and for what purpose they were made, would be premature.  The government's expert asserts that short of a certain level of completeness and functionality, there is not a copy.  *See* Def.'s Resp., Ex. WWW (Ronald Schnell's Report) (saying repeatedly that plaintiff's expert's types of copies are not "runnable" instances of TETRA and should not be counted as copies).  We are unwilling to reject that assertion without further factual development.

### D.  Government Over-installations

Finally, plaintiff argues that it is entitled to summary judgment that the government made at least 79,220 copies of TETRA and at least 74,115 copies of TETRA Enterprise Studio based on its expert's findings, and that,

---

[22] *Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 488 F.3d 352, 359 (6th Cir. 2007) (holding that a defendant was "liable for all the unauthorized copies it made, regardless of whether these copies were accessible or used.").

[23] *Bitmanagement Software GmBH v. United States*, No.16-840C, Dkt. 80 (Ct. Fed. Cl., Mar. 22, 2019)  (ruling on a motion in limine excluding in part an expert's testimony because the expert calculated damages "based on the number of copies allegedly *used* by the [government] rather than *made* by the [government]," as the "number of unauthorized copies must be determined." (Emphasis in original).)

[24] As stated before, the parties do not squarely present what exactly a copy is.  Further, there appears to be some confusion between the parties' experts on what certain types of copies entail.  For example, Mr. Schnell, when discussing plaintiff's expert's counting of "Full Reserve VM" copies, works from many assumptions of what Mr. Myers did, as it is not clear to Mr. Schnell what exact kinds of images or files Mr. Myers used to discuss Full Reserve VM Copies.  Def.'s Resp., Ex. WWW at ¶ 39.

if those copies were generated after the government exceeded the EULA, then those copies were infringing. Plaintiff does not argue which particular copies are infringing, stating that "the exact number of cores and seats associated with each copy of TETRA will be determined at trial." Pl.'s Mot. at 55.

Plaintiff has organized those copies into the following charts:

| TETRA Healthcare Federator (TETRA Services, TETRA Audit, TETRA Snap Cache, or TETRA Enterprise Studio) | |
|---|---|
| Copy Type | Copies |
| Deployed/VM | 162 |
| Deployed/OVA | 162 |
| Distribution/OVA | 213 |
| Deployed/Update | 7,223 |
| Total SDLC | 7,760 |
| Full Reserve VM (Primary Full Daily Backup of VM) | 20,937 |
| Full Reserve VM (Off-Site Full Daily Backup of VM) | 14,476 |
| Full Reserve VM (Primary Full Daily Backup of IR) | 14,476 |
| Full Reserve VM (Off-Site Full Daily Backup of IR) | 14,476 |
| Full Reserve VM (Veeam Offsite backup) | 21 |
| Full Backup – OS Level | 2,068 |
| Total Backup | 66,454 |
| RAM - DTC | 163 |
| RAM - SMS | 4,843 |
| Total RAM | 5,006 |
| Total TETRA Healthcare Federator | 79,220 |

| TETRA Enterprise Studio | Copies |
|---|---|
| Deployed/VM | 162 |
| Deployed/OVA | 162 |
| Distribution/OVA | 213 |
| Deployed/Update | 7,222 |
| Full Reserve VM | 64,288 |
| Full Backup – OS Level | 2,068 |
| Total TETRA Enterprise Studio | 74,115 |

Pl.'s Mot. at 26–27. Plaintiff's count of TETRA and TETRA Enterprise Studio copies comes from an exhibit attached to its expert's, Mr. Myers's, report.[25]

---

[25] Plaintiff "summarize[d] total copy counts indicated in Exhibit C to Monty Myers's report, which is a voluminous Microsoft Excel spreadsheet with multiple tabs comprising tens of thousands of lines tracking every copy of TETRA counted by [Mr. Myers]. Pl.'s Mot. at 26, n.131.

While the government does dispute whether certain types of copies are infringing, it also asserts that its expert disputes the actual number of copies. Def.'s Resp. at 53 (citing Ex. WWW, Ronald Schnell's Expert Report). The disagreements raised by Mr. Schnell as to the number of copies, however, relate to whether certain types of copies included in plaintiff's expert's count were actually copies, such as whether RAM[26] or non-functional copies.[27] This is the issue we reserved above, however, for further factual development.

Mr. Schnell also disagrees with the number of cores and seats plaintiff's expert associates with its count of TETRA copies.[28] Even plaintiff concedes that the number of cores and seats associated with the copies is an issue for trial. Thus, this portion of the plaintiff's motion is denied.

II.     Defendant's Motion for Summary Judgment

A. Release

The government argues that 4DD cannot pursue its copyright infringement claims because it released any such claims when Immix signed the true-up modification. The modification states, "In consideration of the modification agreed to herein, the contractor hereby releases the government from any and all liability under this contract for further equitable adjustments attributable to such facts and circumstances giving rise to this particular modification. All other terms and conditions remain unchanged." Def.'s Mot., Ex. KK at 1. The government argues that this constitutes an accord and satisfaction, barring any claims for copyright infringement by 4DD. It claims that the "facts and circumstances giving rise to this particular modification" refers to all instances of alleged over-installation by the government, and because 4DD did not reserve the right to seek compensation for the copies for which it now seeks compensation, then plaintiff's infringement claims are waived.

4DD presents multiple challenges to the government's release. It argues that (1) the release does not cover copyright infringement, as it only

---

[26] Pl.'s Mot., Ex. WWW, ¶ 23.

[27] *See id.* (discussing repeatedly whether certain types of copies Mr. Myers counts should count as functional copies).

[28] *See id.*

released contract claims and copyright infringement is a tort claim; (2) Immix did not have the authority to release 4DD's copyright infringement claims; (3) the release only extends to claims on the 168 cores in the release; and (4) the release is not valid because the government misrepresented the number of cores to plaintiff, or there is at least a question of fact as to whether there was a misrepresentation.  We do not agree with plaintiff's first three arguments; we do agree, however, that there is a question of fact of whether the release is valid.

First, plaintiff argues that the release only covers claims arising under the contract, whereas its claim of copyright infringement is a tort.  The language in the release states that 4DD released the government from liability "under this contract for further equitable adjustments."  Def.'s Mot., Ex. KK.  Thus, 4DD contends that its copyright infringement claims, as torts, are not released.  This reading of the release, however, ignores the context in which it was made.  4DD's copyright infringement claims are inextricably linked to the parties' respective contractual rights, including the effects of the release.  Vis a vis the government, plaintiff's copyright claim is no better than what remains after the contractual release.

4DD then claims that Immix could not release copyright claims as it did not have the authority to do so.  4DD argues that the reseller agreement only gave Immix a non-exclusive license to resell TETRA, and it did not make Immix its agent.  Pl.'s Resp. at 23 (citing Ex. 106, § 5.1(a)).  4DD admits that it gave Immix the authority to execute the release, but it contends that such authority did not include infringement claims.[29]  Pl.'s Resp. at 23–24.  It argues that it reserved any rights not granted to Immix, including the right to release 4DD's copyright infringement claims.  *Id.* at 23 (citing Ex. 106, § 2.4).

The government claims that Immix acted as 4DD's agent.  It points to the fact that Immix could not act without 4DD's approval, that 4DD would receive the entire payment for the modification, and that "Immix acted on 4DD's behalf," during the negotiations and resulting modification.[30]  Def.'s Reply at 5.  We agree with the government.

---

[29] We discussed in the paragraph above why the release encompasses 4DD's copyright infringement claims.

[30] The government points to various exhibits to show how 4DD acted as the principal in this relationship.  Def.'s Reply, Ex. XXX (Immix asking for "thoughts/plans" from 4DD on how to move forward with the negotiation); Ex. YYY (4DD would generate a quote for Immix to use in negotiations as

"An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01. Although 4DD claims it did not make Immix its agent, 4DD gave Immix the authority to agree to the release, which encompasses the copyright infringement claim. Further, Immix had to ensure that 4DD was satisfied with the release before agreeing to it. Def.'s Reply at 6, Ex. BBBB (email between 4DD employee, Patrick Truxillo, and Immix employee, Zachariah Kebetz, with Truxillo telling Kebetz to "not move on [the modification] without an ok from [4DD]."). Immix therefore had authority to agree to the release for 4DD, and because the release included any copyright infringement claim, as we stated above, Immix had the authority to release 4DD's copyright infringement claim.

4DD also argues that the release only extends to the 168 TETRA cores at issue in the modification. We find this reading of the release to be too narrow. "[S]uch facts and circumstances giving rise to this particular modification" clearly refers to all over-installations by the government, not the negotiated total between the parties. The over-installations gave rise to the modification, so the release naturally encompasses the facts and circumstances surrounding all over-installations, not merely the 168 agreed-upon ones. Overall, the release, if it meets the standards of an accord and satisfaction, will apply to 4DD's copyright infringement claims.

Finally, 4DD's last argument against the appropriateness of summary judgment attacks the validity of the release. An accord and satisfaction requires four elements: "(1) proper subject matter; (2) competent parties; (3) a meeting of the minds of the parties; and (4) consideration." *Holland v. United States*, 621 F.3d 1366, 1382 (Fed. Cir. 2010) (quoting *O'Connor v. United States*, 308 F.3d 1233, 1240 (Fed. Cir. 2002)).

4DD claims that there was no meeting of the minds because the government misrepresented the number of overinstallations during the true-up negotiations. 4DD asserted that the government "stated that it had conducted a full and complete count of all the installations of TETRA in the DTC." Def.'s Resp. at 20 (quoting Ex. 68, Plaintiff's Response to Defendant's Request for Admissions, at ¶ 139). Instead, 4DD alleges that

---

an estimate); Ex. AAAA (4DD's CEO, Mr. McPhatter, asking Immix to insert language into the contract modification).

the government never completed a full count of the overinstallations,[31] never told 4DD or Immix that it had an incomplete count,[32] and misled 4DD about the finality of the core count during negotiations.[33]  Further, the government, as 4DD says and as we have previously found, destroyed relevant copies of 4DD, further preventing 4DD from being able to assess their damages.  4DD also claims that the government "falsely claimed to senior Government officials" that it had accurately counted the overinstallations.[34]  Pl.'s Resp. at 18 (citing Ex. 19).

The government, however, contends that 4DD's lack of knowledge surrounding the true-up negotiations is its own fault.  It claims that 4DD was aware of the copying and made no inquiries about the overinstallations.  Further, 4DD, of its admission, could have requested permission to examine machines, but it did not do so.  The government also claims "4DD was aware that the government was still investigating the number of installations at the DTC at the time 4DD accepted the 168 processor core figure."[35]  Def.'s Reply at 11 (citing Ex. BB).

---

[31] Pl.'s Mot. Ex. 51 (email between government officials stating that they would "float[] a number" to 4DD); Ex. 18 (Sheila Swanson dep.) (Ms. Swanson confirming that she "had no idea" the number of TETRA cores actually installed after representing to 4DD that 232 cores were installed (64 in license + 168 from true up negotiations).

[32] Pl.'s Mot., Ex. 56 (Contracting Officer Gina Walker dep.) (Ms. Walker, when asked if the government told 4DD that it had installed more than 232 cores, responded, "I don't believe so.")

[33] For example, a contracting officer's representative, Sheila Swanson, told Patrick Truxillo, an employee of 4DD, that "the Government has identified an over deployment of 168 core licenses."  Pl.'s Resp., Ex. 53.

[34] This description of plaintiff's Exhibit 19, a memorandum to senior government officials, is misleading, however.  The memo specifically says that the officials working on the true up "settle[d]" on 168 overinstallations, making this appear less like a misrepresentation to senior officials and more like a compromise.

[35] The exhibit cited by the government is a call summary between the parties, during which the government informed 4DD that it was still attempting to "confirm the amount of cores that have been allocated in the DTC)."  Def.'s Reply at 11, Ex. BB.  They were also working to finalize a total number of

The parties' dispute as to what occurred and was said during the true-up negotiations creates disputes of fact not suitable for summary judgment. It is unclear what exactly was said between the parties during the negotiations and whether the government misrepresented the number of overinstallations to 4DD. The exhibits cited by the parties are similarly unclear. Accordingly, the question of whether the release was valid requires trial. Therefore, this portion of the government's motion is denied.

## B. 17 U.S.C. § 117

The government then argues that, under the Copyright Act, it was entitled to make most of the copies of TETRA for which 4DD now seeks compensation. 17 U.S.C. § 117(a) (2018) states, "[I]t is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided:

> (1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner, or

> (2) that such new copy or adaptation is for archival purposes only and that all archival copies are destroyed in the event that continued possession of the computer program should cease to be rightful.

The government claims that the "vast majority" of the copies at issue were "either backup copies or copies created as an essential step in running the TETRA software." Def.'s Mot. at 24. Before we reach the issue of whether the copies were for archival purposes only or as an essential step in the use of TETRA, we must first decide the threshold issue of whether the government is an owner of a copy of TETRA.

The government maintains that it is an owner of a copy of TETRA. Because it bought a perpetual license and because it "had the discretion to use, install, discard, or otherwise use" TETRA as it wanted, it became an owner of a copy of TETRA. Citing cases from the Second Circuit and the Eastern District of Virginia, the government argues that those "indicia of ownership" are sufficient for a party to qualify as an owner of a copy under 17 U.S.C. § 117(a).

---

cores for the parties and establish a "minimum threshold" of overinstallations.

Plaintiff disagrees.  Plaintiff argues that the EULA specifically stated that the government would have no ownership rights in any copies of TETRA.  Further, plaintiff claims there were strict limitations on the government's rights regarding TETRA, demonstrating that the government is not an owner of a copy of TETRA.  Finally, plaintiff argues that the cases cited by the government to support its position are not applicable to the current case. We agree with plaintiff.

An "[o]wner of a copy of a computer program" is not defined by the Copyright Act.  In *DSC Communications Corp. v. Pulse Communications, Inc.*, 170 F.3d 1354 (Fed. Cir. 1999), cited by plaintiff in support of its position, the Federal Circuit grappled with this lack of guidance.  With the lack of a definition and because "ownership is an imprecise concept," the court first looked to the legislative history of this part of the Copyright Act. *Id.* at 1360.  When updating the Copyright Act to "accommodate advances in computer technology," Congress created the National Commission on New Technologies Uses of Copyrighted Works ("CONTU") to suggest updates.  CONTU's proposed version of § 117 contained one key difference from the enacted version: it gave the rights enumerated in § 117 to any "rightful possessor of a copy," not an owner of a copy.  While Congress did not explain its reasoning for the change, the court in *DSC* noted that Congress must have wanted a party to show more than mere "rightful possession" to invoke § 117.

The court then looked to the leading case at the time on § 117, *MAI Sys. Corp. v. Peak Computer, Inc.* 991 F.2d 511 (9th Cir. 1995).  The Ninth Circuit had held that the defendant was not an owner of a copy of software because it had only licensed the software.  *Id.* at 518 n. 5.  This approach, however, was emphatically rejected by the Federal Circuit.  "[A] party who purchases copies of software from the copyright owner can hold a license under a copyright while still being an 'owner' of a copy of the copyrighted software for purposes of section 117."  *DSC Commc'ns Corp.*, 170 F.3d at 1360.

*MAI*, however, did still hold lessons for the Federal Circuit in *DSC*. The Federal Circuit noted that the agreement between the copyright holder and licensee in *MAI* was similar to the same type of agreement in *DSC*, namely that the agreement in *MAI* "imposed more severe restrictions on [the licensee's] rights with respect to the software than would be imposed on a party who owned copies of software."  *Id.*  Those restrictions, according to the court, were enough to render a licensee a non-owner.

The Federal Circuit then looked to the agreements at issue in *DSC*. The court first found that the agreements characterized the licensees as non-owners of copies. Further, restrictions in the agreements on the licensees supported that characterization. Notably, the agreement restricted the rights of the licensees "in ways that are inconsistent with the rights normally enjoyed by owners of copies of software." *Id.* at 1361. For example, §§ 109 and 117 of the Copyright Act afford owners of copies of software certain rights, such as the "first sale doctrine" under § 109 and the right "to reproduce or adapt the program if reproduction or adaptation is necessary for the program to be used in conjunction with a machine" under § 117, yet the agreements in *DSC* specifically curtailed those rights, further showing that the licensees were not owners of copies of the software.

The district court opinion under review in *DSC* had characterized the licensees as owners of a copy of software because the licenses were perpetual and obtained for a single payment. The Federal Circuit disagreed with this assessment. While whether a license is perpetual or whether it is obtained after a single payment is relevant to the analysis, "those factors are not necessarily dispositive if the possessor's right to use the software is heavily encumbered by other restrictions that are inconsistent with the status of owner." *Id.* at 1362. Ultimately, the licensees in *DSC* were not owners of a copy of software.

The agreement in this case is more similar to the agreements in *DSC*. First, like the agreements in *DSC*, the EULA clearly says that the government does not own any of the copies of TETRA. The EULA states, "All right, title and interest, including, without limitation, all intellectual property and proprietary rights, in and to [TETRA] (including, without limitation derivatives and modifications thereof) ***and any copies thereof are owned by [4DD]*** or its suppliers. You disclaim all interest therein." Pl.'s Resp. at 43 (quoting Ex. 16 at § 7) (Emphasis in original). Under the EULA, the government has no ownership interest in a copy of TETRA. Further, the EULA contains a number of restrictions on the government's use of TETRA. *See id.* at 43–44 (listing various restrictions on the government's use of TETRA found in Ex. 16).

Moreover, there are restrictions in the EULA that mirror those in *DSC* by curtailing the rights an owner of a copy of TETRA would have under sections 109 and 117. Similar to language in the *DSC* agreements, the EULA in this case recites that the government cannot "give, permit the use of or distribute any copies of [TETRA] to any third party." Pl.'s Resp. at 43 (quoting Ex. 16 at § 2(b)) (alterations in original). Also, the government, its agents, and its contractors cannot "rent, lease, make available, give access to,

sell, sublicense or lend [TETRA] to any third parties or use [TETRA] in any type of service bureau arrangement." *Id.* (quoting Ex. 16 at § 2(d)) (alterations in original). Those clauses limit rights under § 109 to transfer owned copies of software, as was the case in *DSC*. Further, the EULA prohibits any copying of TETRA, Pl.'s Resp. at 43, Ex. 16 at § 2(b), contrary to what an owner of a copy of TETRA could do under § 117(a)'s right to make archival and essential-step copies. As in *DSC*, the EULA clearly restricts the rights that one would normally have if one was an owner of a copy of TETRA.

The government nevertheless argues that it is an owner of a copy of TETRA due to its perpetual license and its "discretion to use, install, discard, or otherwise use" TETRA. Def.'s Mot. at 25. For support, the government cites two cases from the Second Circuit, *Krause v. Titleserv, Inc.*, 402 F.3d 119 (2d Cir. 2005), and *Universal Instruments Corp. v. Micro Systems Engineering, Inc.*, 924 F.3d 32 (2d Cir. 2019), and one from the Eastern District of Virginia, *Softech Worldwide, LLC v. Internet Technology Broadcasting Group*, 761 F. Supp. 2d 367 (E.D. Va. 2011). According to the court in *Softech*, both *Krause* and *Softech* presented similar fact patterns. A copyright holder developed software for companies without a written agreement, and that software was in the possession of and accessible to the company. The copyright holder was paid for his contribution and left copies of the software on the company's servers. This was enough in both cases to qualify the companies as owners of copies of software. *Krause*, 402 F.3d at 124–25; *Softech*, 761 F. Supp. 2d at 373–74. In *Universal Instruments*, the facts are similar, as a copyright holder developed software for a company for substantial consideration and copies of the program were delivered to the purchaser. 924 F.3d at 45–46. The difference here is that there was a written agreement between the parties.

All three cases presented similar reasoning as to why the licensees were owners of copies of the respective software. In all three, owners of the copies paid substantial consideration to the copyright holders for the software. The software was customized for the purchaser in each case. Copies of the software were stored on the purchasers' servers. Finally, all three allowed the purchaser to destroy or discard the software as they saw fit.

None of those cases are similar, therefore, to the current case. While the government, like the owners of the copies in the other cases, did make a one-time payment of substantial consideration to 4DD to use TETRA with seemingly no limitation on being able to discard it, that is largely where the similarities end. In all three cases, the software provided to the owners of copies were customized for those companies specifically, giving those

companies a closer relationship with the software to consider them an owner. Here, however, TETRA is a commercial off-the-shelf solution sold to the government through a license with no customization by 4DD or Immix. Further, in *Krause* and *Universal Instruments*, owners of copies were permitted to continue using the software even if their relationship with the copyright holder ended.  There is no such right for the government here, as the EULA expressly states that if the government and 4DD end their relationship, the government must stop using TETRA and delete all copies of it.  *Krause* and *Softech*, notably, do not even contain a written agreement with restrictions comparable to those in the EULA.  The courts in those cases also recognized that the copyright holder could not repossess the software, while the EULA here allowed 4DD to revoke the license. Although in *Universal Instruments* the Second Circuit rejected the copyright holder's argument that there were restrictions in the agreement similar to *DSC* that prevented the other party from being classified as an owner, the language in that agreement and that in the EULA here is remarkably different.  The language in the *Universal Instruments* agreement stated that the owner of the copy, its subcontractors, and its suppliers were granted a "non-exclusive, royalty-free, worldwide, perpetual license, to use, reproduce, display, of the Pre-Existing Intellectual Property for MSEI's internal use only."  That language is far broader than anything in 4DD's EULA, with its multiple restrictions.

Further, even if the cases that the government cited were applicable here and its ability to "use, install, discard, or otherwise use," Def.'s Reply at 13, TETRA at its discretion would otherwise indicate that the government is an owner of a copy of TETRA for purposes of § 117(a), the government would still face severe restrictions that cut sharply against characterizing it as an owner.  The government does not grapple with these restrictions in the EULA.  It merely asserts, without explanation, that the clauses cited by 4DD "refer to 4DD retaining the copyright to [TETRA] and do not 'severely limit the rights'" of [the Government] to use the software." *Id.* at 15 (quoting *DSC Commc'ns Corp.*, 170 F.3d at 1361).  This assertion does not comport with the restrictions discussed above that limit the government's rights under sections 109 and 117.

The government also cites *DSC* and *Krause* to support its argument that its perpetual license grants it ownership of a copy of TETRA, saying that a "licensee, particularly a perpetual licensee, can be an 'owner.'" *Id.* at 15. This reference to *DSC* conveniently omits a key caveat from the Federal Circuit discussed above: even if a license is perpetual, that will still not be enough to overcome severe restrictions in an agreement that are inconsistent with the ownership of a copy of software.  *DSC Commc'ns Corp.*, 170 F.3d

at 1362.  Those restrictions are present here, greatly weakening any perpetual license's effect on ownership.

Based on the restrictions and characterization of the government as a non-owner in the EULA, we find that the government is not an owner of a copy of TETRA for purposes of § 117(a).  Because the government is not an owner, we need not reach the issue of whether the copies at issue meet the standards under § 117(a)(1)–(2).

## CONCLUSION

Plaintiff's motion is granted in part and denied in part.  We grant insofar as we hold that plaintiff has a copyright in TETRA, that the EULA prohibited excess copying, that the prohibitions on copying were covenants, and that government would violate the Copyright Act if it copied in excess of the EULA.  We deny the motion, however, insofar as we are asked to rule that certain types of copies of TETRA are infringing and on how many copies of TETRA the government made.  Fact questions still remain.  The government's motion is denied in full.  There remains a fact question regarding whether the government misrepresented the extent of its copying of TETRA during the true up negotiations, possibly rendering the release invalid.  Further, as a matter of law, the government is not an owner of a copy of TETRA for the purposes of 17 U.S.C. § 117.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge