# In the United States Court of Federal Claims

No. 15-945C
(Originally filed: April 26, 2024)
(Re-issued: May 17, 2024)[1]
NOT FOR PUBLICATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

4DD HOLDINGS, LLC, and
T4 DATA GROUP, LLC,

    *Plaintiffs*,

v.

UNITED STATES,

    *Defendant,*

    and

IMMIX TECHNOLOGY, INC.,

    *Third-Party Defendant.*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## ORDER

    We issued our post-trial opinion in this case on August 22, 2023. 169 Fed. Cl. 164 (2023). We found that defendant had infringed 4DD's copyright by surreptitiously making tens of thousands of unlicensed copies of 4DD's Tetra software. On November 20, 2023, we ordered that defendant pay plaintiffs a total of $12,683,065.86 in damages and directed entry of final judgment. ECF No. 349. On December 19, 2023, plaintiffs filed a supplemental motion for fees and costs related to our earlier spoliation order, and on December 26, 2023, plaintiffs filed a motion under Rule 59 for reconsideration or a new trial. After directing a response to the

---

[1] This order was issued under seal to give the parties an opportunity to propose the redaction of any protected material. They did not propose any redactions, and thus the order is released in its original form.

reconsideration motion, both motions are fully briefed. Oral argument is unnecessary. We begin with the motion for reconsideration.

I. Reconsideration

Rule 59 of the United States Court of Federal Claims provides that the court may entertain a motion for reconsideration under certain circumstances. We may generally only "'grant a motion for reconsideration when there has been an intervening change in the controlling law, newly discovered evidence, or a need to correct clear factual or legal error or prevent manifest injustice.'" *Biery v. United States*, 818 F.3d 704, 711 (Fed. Cir. 2016) (quoting *Young v. United States*, 94 Fed. Cl. 671, 674 (Fed. Cl. 2011)).

"[M]otions for reconsideration are seldom appropriate," and must be supported "by a showing of extraordinary circumstances which justify relief" to succeed. *Cully Corp. v. United States*, 165 Fed. Cl. 737, 739 (2023); *Caldwell v. United States*, 391 F.3d 1226, 1235 (Fed. Cir. 2004). They "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Behrens v. United States*, 135 Fed. Cl. 66, 69 (2017) (quoting *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008)). In other words, "a motion for reconsideration is not intended . . . to give an 'unhappy litigant an additional chance to sway' the court," nor to allow a party to "re-hash[] the same arguments already considered by the court." *Behrens*, 135 Fed. Cl. at 69 (quoting *Matthews v. United States*, 73 Fed. Cl. 524, 525 (2006)).

Plaintiffs argue that our trial opinion contained four errors, one legal and three of a factual nature. We begin with the asserted legal error and then turn to factual disagreements.

A. There Was No General Acquiescence And No Legal Error

Plaintiffs urge that the court committed a "fundamental legal error in determining damages" by constructing a hypothetical negotiation to value defendant's unauthorized use rather than simply applying the license rates originally agreed to by the Department of Defense. Pl.'s Mot. for Recons. 4. Plaintiffs argue that we are legally compelled to apply the parties' license agreement when calculating damages for the infringing software copies, and thus any consideration of whether there was any general acquiescence to those rates was unnecessary and erroneous.

2

In our trial opinion, we found that the originally agreed-upon rate did not constitute an established royalty because this rate was only used in a single agreement, which could not demonstrate the necessary "'general acquiescence' by a significant 'number of persons'" necessary under Federal Circuit caselaw. 169 Fed. Cl. at 184 (citing *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995), quoting *Sun Studs, Inc. v. ATA Equip. Leasing, Inc.*, 872 F.2d 978, 993 (Fed. Cir. 1989), *overruled on other grounds*, *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020 (Fed. Cir. 1992)). Plaintiffs contend that this requirement does not apply because the defendant itself, rather than a third party, acquiesced to the rate in the original license agreement. Thus, it ought not have to prove anything beyond a pre-existing license, aver plaintiffs. Just as we did after trial, again, we disagree.

As cited in our trial opinion, the Federal Circuit explained that, for a pre-existing, or "established rate," to be controlling for damages purposes it must have been, *inter alia*,

> one, . . . agreed to prior to the infringement; two, . . . paid by such a number of persons as to indicate a general acquiescence in its reasonableness by those who use the invention or was paid by an exclusive licensee who had such a significant amount of sales volume as to indicate a general acquiescence in its reasonableness by those who use the invention . . . .

*Sun Studs, Inc. v. ATA Equip. Leasing, Inc.*, 872 F.2d 978, 993 (Fed. Cir. 1989). We found that a single, non-exclusive license to one licensee could not and did not meet this standard. 169 Fed. Cl. at 184. Although not explicitly expounded in our trial opinion, we think it is implicit in our explanation for the rejection of the license rate that the usage contemplated by that agreement is not analogous to the infringing use. As the *Sun Studs* court further explained, the established royalty must also be paid for "comparable rights of activity under the patent." 872 F.2d at 993. The 64-core license bought by the government in this case is not comparable to the infringing use (tens of thousands of copies). *See also Bitmanagement Software GmbH v. United States*, 989 F.3d 938, 950–51 (Fed. Cir. 2021) (holding that, despite the existence of a license for a limited number of copies, the proper measure of damages was a hypothetical negotiation covering the "actual usage."). The established royalty rubric is inapposite here.

Nor do the cases cited by 4DD in its motion require a different result. In *Rude v. Westcott*, the Supreme Court laid out the test for an established

royalty much as was echoed in *Sun Studs*, cited above, noting that, in order to apply a pre-existing license rate against an infringer, that rate must have been commonly paid by sufficient persons such that a "market price" was established. 130 U.S. 152, 165 (1898). There is nothing approaching such a situation here.

As defendant points out, the courts in *Micro Data Base System v. State Bank of India* and *Herrmann International, Inc. v. Hermann International Europe* applied the parties' agreed-upon royalty when calculating damages because the defendants did not contest the use of that royalty rate. *Micro Data Base Sys. v. State Bank of India*, 177 F. Supp. 2d 881, 888 (N.D. Ind. 2001); *Herrmann Int'l, Inc. v. Herrmann Int'l Eur.*, No. 17-cv-00073, 2021 U.S. Dist. LEXIS 42277, at *1–2 (W.D.N.C. Mar. 6, 2021). Neither case expresses a rule to contrary to the result here.

Other cases plaintiffs cite serve to weaken its position. As defendant rightly noted in its post-trial brief, in *Szekely v. Eagle Lion Films, Inc.*, 242 F.2d 266 (2nd Cir. 1957), the damages award was based on a "reasonable license fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer"—precisely what we did here. *On Davis v. The Gap, Inc.*, 246 F.3d 152, 167–68 (2d Cir. 2001) (explaining the holding in *Szekely*).

Neither does the district court decision in *Propet USA, Inc. v. Shugart* suggest a different outcome. The district court relied on actual invoices from the copyright holder to establish a reasonable fee for unlicensed use. No. C06-0186, 2007 WL 2766718, at *2 (W.D. Wash. Sep. 19, 2007). There, the infringer had a history of paying the copyright holder when it, and third parties who the infringer distributed the images to, used the copyrighted images outside of the terms of their existing license. That circumstance is quite distinct from the evidence in this case. Further, the trial court in *Propet* and plaintiffs now, cite *Thoroughbred Software International, Inc. v. Dice Corp.*, 488 F.3d 352, 359 (6th Cir. 2007), for support. In that case, the issue on appeal was whether the plaintiff had proven a causal connection between the infringing use and the actual damages claimed. The circuit court held that the Dealer Agreement (license) between the parties established that nexus because, pursuant to that agreement, the dealer owed a license fee for every copy purchased and additional copies were expressly prohibited. *Id.* at 359–60. Thus it did not matter that the unlicensed copies were never used. Using the Dealer Agreement's existing rate structure was an appropriate measure of damages in that case. *Id.* at 360. It is important to note, however, that the court relied on *Davis v. Gap, Inc.*, wherein the Second Circuit stated that "actual damages may include in appropriate cases the reasonable license

4

fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer." 246 F.3d 152, 166–67 (2d Cir. 2001). In the case at bar, however, we found the opposite. These holdings are grounded in a finding of reasonableness of the license fee in the particular circumstances of those cases. In *Thoroughbred*, the unlicensed use was merely dozens of copies, wholly unanalogous to the tens and hundreds of thousands claimed here. *See* 246 F.3d at 360 (noting 17 copies of one software program and 31 of another).

A similar result is found in the trade secret cases cited by plaintiffs. In those cases, the pre-existing agreements contemplated the type and scope of the infringing use. *See Ford Motor Co. v. Versata Software, Inc.*, No. 15-11624, 2018 WL 10733561, at *8–9 (E.D. Mich. July 9, 2018); *Biodynamic Techs., Inc. v. Chattanooga Corp.*, 658 F. Supp. 266, 269 (S.D. Fla. 1987). It was a straightforward exercise to apply the rates the parties had already negotiated to the facts of those cases. That was not the case here.

The other trade secret decision cited by plaintiffs supports the use of a hypothetical negotiation to calculate damages, as we did here, by endorsing the proposition that "[a] reasonable royalty award attempts to measure a hypothetically agreed value of what the defendant wrongfully obtained from the plaintiff." *Mid-Michigan Comp. Sys. v. Marc Glassman, Inc.*, 416 F.3d 505, 511 (6th Cir. 2005) (citing and quoting *Vermont Microsys., Inc. v. Autodesk, Inc.*, 88 F.3d 142, 151 (2d Cir. 1996)).

As explained after trial, and above, the license between 4DD and the Department of Defense was not sufficient evidence of a generally-acquiesced-to rate paid. Such an application would have been unjust because the use was not analogous. Our task was thus to construct a hypothetical negotiation. Plaintiffs have not shown a legal error and thus no manifest injustice. We turn then to plaintiffs' challenge to our hypothetical negotiation.

B. The Court's Hypothetical Negotiation Was Not Flawed Factually

Plaintiffs now attempt to convince us that our calculation of damages using a hypothetical negotiation resulted in multiple factual errors. We note that the common theme is that plaintiffs disagree with the outcome of our damages analysis. They read the facts differently but cannot show that we ignored any crucial piece of evidence nor the law.

5

1.  Developmental License, Volume Discount, and Backup Copies

First, plaintiffs take issue with our judgment that the government would have purchased development licenses rather than production licenses. Second, plaintiffs assert that we erroneously applied 4DD's volume discount in the context of the hypothetical negotiation. Third, plaintiffs dispute our method of awarding damages for backup copies. Each of these amount to naught but disagreements with the outcome. Plaintiffs have not shown a plain error of fact evincing a manifest injustice.

The issue of whether a production license or a developmental license would be appropriate was litigated and decided at trial. We have ignored neither plaintiffs' argument nor their evidence but found a different outcome than they prefer. That is not grounds for reconsideration. Likewise, the opportunity to argue whether the volume discount formula should be applied to development licenses has also passed. We made a factual finding that a volume discount would have been made available to the government. The issue was argued extensively at trial and afterwards in briefing. The matter is closed, and reconsideration unavailable.

Plaintiffs' argument that we erroneously awarded a convenience fee for backup copies likewise fails. Defendant argued in its post-trial brief, and we agreed, that 4DD would not have insisted on a per-unit royalty for backup copies of Tetra, an assertion to which plaintiffs mounted no response in their briefs. If plaintiffs wished to convince us to apply a per-unit royalty rather than a blanket convenience fee for backup copies, they had ample opportunity to do so before judgment was entered. Instead, plaintiffs waited until now to respond to defendant's argument on that point. Plaintiffs may not now "raise arguments that could have been raised prior to the entry of judgment."[2]  *Behrens*, 135 Fed. Cl. at 69.

---

[2] Plaintiffs also raise a point about our recognition that they did not include in their damages tally of backup copies those made after September 2014. Though it was unexplained, we took Mr. Myers' figures at face value and declined to consider backup copies after September 2014. *See* 169 Fed. Cl. at 182 n.17. Plaintiffs now, inappropriately, argue for the first time that we ought to have considered that a floor figure or some sort of conservative estimate. The time for making such a distinction has passed. In any event, we note that the issue is moot given our application of a 20-percent convenience fee for backup copies.

Case 1:15-cv-00945-EGB   Document 364   Filed 05/17/24   Page 7 of 10

## 2. Damages Awarded for Tetra Studio

Lastly, plaintiffs urge us to reconsider our decision to award a $150,000 convenience fee for the infringing copies of Tetra Enterprise Studio. Instead, plaintiffs again argue that we must award them more than $3,000 (and likely at least $4,397) for each of the more than 171,000 infringing copies of Tetra Studio made by the government. Like the other arguments plaintiffs advance in its motion for reconsideration, this one is familiar to us because it was thoroughly ventilated by the parties during trial and after it in briefing.

We found no evidentiary basis to award plaintiffs the per-seat figures they sought because it made no economic sense to pay for hundreds of thousands of seats for a team of 100 people. 169 Fed Cl. at 189–90. We had to consider the intended use, as the parties would have at the hypothetical negotiation table. Without evidence of some better metric upon which to base damages for this infringing use, we applied statutory damages. *Id.* at 190. There is nothing in plaintiffs' request for reconsideration that would change our mind and that we have not already considered. Reconsideration must therefore be denied.[3]

## II. Fees and Costs

Turning then to the supplemental request for fees and costs, we begin with what we previously held: that the government failed to preserve and, in some instances, knowingly destroyed evidence; thus we found that a spoliation sanction was warranted. 143 Fed. Cl. 118 (2019). As part of that sanction, we shifted costs and fees to defendant, and asked plaintiffs to file an "appropriately supported" motion seeking their recovery. *Id.* at 134. Plaintiffs did so, seeking not only attorney fees but also expert and consultant costs as well.

We held that expert and consulting fees were permissible as a general matter under Rule 37. 153 Fed. Cl. 371, 375–76 (2021). As to plaintiffs' expert, Mr. Monty Myers, we found the request unreasonable, however, because his fees were unsupported by sufficiently detailed contemporaneous

---

[3] In defendant's response, it argues that the court should not have awarded maximum statutory damages because those only apply when the use was "willful" and "wrongful," neither of which can be applied against the United States. We do not reach that issue, however, because it is improper to use the opposing party's Rule 59 motion as an opportunity to raise new arguments. Defendant's time for filing its own such motion has passed.
7

billing records. *Id.* at 376–77. Plaintiffs also sought reimbursement for the work of Tetra Engineering, a subsidiary of 4DD that worked with Mr. Myers to quantify defendant's infringement. Although we found the rate reasonable and the hours supported, the court deferred awarding Tetra Engineering's costs because it was unclear whether and how much of the work performed was due to the missing evidence. It was also unclear whether all of the work was in pursuit of well-founded legal claims. *Id.* at 378 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 435–36 (1983) (holding that partial or legal success is relevant to the reasonableness of claimed fees)).

Trial was held in 2023, resulting in an award to plaintiffs, exclusive of delay compensation and any offset for copies already paid for, of $9,307,594.52 for non-backup copies of 4DD's software, $1,834,984.57 for backup copies, and $150,000 statutory damages for the related Tetra Studio software. Then, after the court resolved the parties' differences regarding delay compensation, the parties stipulated to a final judgment amount of $12,683,065.86. Plaintiffs now seek again $1,284,850 for Mr. Myers' work in the case and $836,955 for Tetra Engineering's work assisting him. The government opposes both sums in whole. We take each in turn.

A. Mr. Myers' Fees

We denied plaintiffs' request for those fees in 2021 because they were unsupported. 153 Fed. Cl. 371 (2021). The gross tally of hours expended by Mr. Myers and his company was insufficient to establish whether the work was in pursuit of information missing due to the government's failure to preserve evidence and even insufficient to establish whether those hours had been billed to and paid for by the plaintiffs. *Id.* at 376–77.

Plaintiffs believe that it has solved these issues primarily through Mr. Myers' detailed testimony at trial and deposition regarding the work he performed and how the spoliated evidence severely impacted it. Plaintiffs also offer, for the first time, additional billing records from Mr. Myers. We agree with the government, however, that the opportunity to support its request for these fees was in the motion seeking them. *Id.* at 377 n.5. Contrary to plaintiffs' present assertion, we did not invite a renewed request for these fees.[4] What remained undecided was only the appropriateness of the engineering fees. *Id.* at 378. We turn now to that issue.

---

[4] Nor is it unfair to have ruled as we did prior to hearing Mr. Myers' testimony at trial or reading his deposition transcript. Plaintiffs supported their original request for fees with an affidavit from Mr. Myers' and one from Mr. McPhatter. The work was complete at this point. Mr. Myers' had every

### B. Tetra Engineering's Fees

With respect to Tetra Engineering's[5] fees, we have no problem knowing what Tetra did and why. The billing records are sufficiently fulsome to support their reasonableness, as we held in 2021. The remaining issues were whether and how much of the engineering work could be apportioned to the government's spoliation and whether the hours were spent in pursuit of meritorious claims. *Id.*

After our spoliation sanction, we have learned more concerning the engineering efforts expended by Tetra Engineering through Mr. Myers' depositions and his testimony at trial. The main takeaway from those testimonies, and as highlighted in plaintiffs' supplemental motion for fees, is that the engineering work centered on the need to create a simulation of DOD's systems in order to see how 4DD's software would have operated, especially with respect to RAM copies. Plaintiffs were entitled to undertake the technical effort needed to explore the extent of potential infringement, and we know now that the engineering work was largely, if not entirely, the result of the spoliation in that it was an effort to fill in the blank left by the government's missing and destroyed evidence. And we know that, as we held previously, the billing records are sufficient to support the reasonableness of the number of hours expended. What was also apparent from Mr. Myers' testimony is that, in the end, these simulations were not his principal method of counting RAM copies, although they did buttress, or in his own words "validate" his conclusions, Myers' Dep. at 20 (ECF No. 354 at 33), and the court considered them in its analysis. They were meritorious in the sense that they supported a plausible claim of infringement.

---

opportunity to provide detail in his affidavit supporting the request for fees. In any event, the principal omission was detailed billings from Mr. Myers with which we could test the accuracy of plaintiffs' assertions regarding the necessity and costs of the work he performed. Further, the invoices now submitted, although indicative of work likely performed and paid for, similarly lack any detail as to what Mr. Myers' was doing outside of providing expert services. *E.g.*, Pl.s Ex. C in support of Supp. Motion for Fees at 1 (ECF No. 354 at 43–44).

[5] We reject defendant's concern that the work is ineligible for reimbursement because Tetra Engineering is a subsidiary of plaintiffs. There is no suggestion that Tetra Engineering is not a separate entity and that plaintiff did not incur the charges.

9

What is not clear is whether these hours were reasonably expended in pursuit of well-founded claims. We now know that although infringing, plaintiffs were not awarded compensation for the RAM copies because the evidence showed that plaintiffs would not have charged for them when negotiating a hypothetical license for the government's use. 169 Fed. Cl. at 189. We think plaintiffs are chargeable with knowledge of that fact. Although RAM copies are infringing and theoretically could form the basis of a damages award, here they did not. Further, even if they had been the basis for some award of damages, the engineering work was not strictly necessary to come up with a figure for those copies. We thus believe that an award of all of Tetra Engineering's fees would be improper because plaintiffs have not established that they were all necessary to support a meritorious claim for damages. They were, however, supported by detailed billing records, not wholly unnecessary to plaintiffs' presentation of evidence of infringement, and, in the final analysis, we conclude that, in light of the uncertainty generated by defendant's destruction of evidence, it is not unfair to give plaintiffs some benefit of the doubt in pursuing the claim with respect to RAM copies. We thus believe a 50 percent reduction is appropriate to balance these considerations.

III. Conclusion

As explained above, plaintiffs have not shown that reconsideration or a new trial is warranted. Further, plaintiffs request for Mr. Myers' fees is denied, but their request for Tetra Engineering's fees is granted in part. They will recover 50 percent of those fees. Accordingly, the following is ordered:

1. Plaintiffs' motion (ECF No. 355) for reconsideration or a new trial is denied.

2. Plaintiffs' supplemental motion (ECF No. 354) is granted in part as outlined above.

3. Plaintiffs are awarded $418,477.50 dollars as a further spoliation sanction.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge